IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SUNEARTH, INC.; THE SOLARAY
CORPORATION,

       Plaintiffs,

  v.

SUN EARTH SOLAR POWER CO., LTD.;
NBSOLAR USA, INC.; and DOES 1-10,

       Defendants.

_____/

No. C 11-4991 CW

ORDER GRANTING
PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION
(Docket No. 25)

    Plaintiffs SunEarth, Inc. and The Soloray Corporation seek a preliminary injunction enjoining Defendants Sun-Earth Solar Power Co., Ltd. and NBSolar USA, Inc. from using the "Sun Earth" name and mark within the United States during the pendency of this action.  Defendants oppose Plaintiffs' motion.  Having considered the papers submitted by both parties and their oral arguments, the Court GRANTS Plaintiffs' motion.

BACKGROUND

    Plaintiff SunEarth, Inc. was created and incorporated in the state of California in 1978.  Reed Decl. ¶ 3.  Plaintiff The Solaray Corporation acquired SunEarth, Inc. on July 1, 1992, and has independently operated SunEarth, Inc. as a subsidiary under its original name since that date.  Id. at ¶¶ 4-6.  Through the SunEarth, Inc. name, Plaintiffs manufacture and sell solar thermal collectors and related components.  Id. at ¶¶ 55, 57.  Plaintiffs registered and began using the domain name www.sunearthinc.com in 1990.  Id. at ¶ 11.

United States District Court
For the Northern District of California

Solar thermal collectors are a type of solar energy technology, which collect the heat of the sun and transfer that heat to a liquid. Id. at ¶ 55. The most common use of solar collectors is to heat water for home or industrial use. Id. at ¶ 56. They can also be used to heat swimming pools or for space heating, and are sometimes used to boil water used for larger-scale power production. Id.

Another type of solar energy technology is photovoltaic, in which photovoltaic cells covert energy from the sun directly into electricity. Reed Decl. ¶ 58; Xie Decl. ¶ 3. Photovoltaics are more expensive than solar collectors, but have a wider variety of uses. Reed Decl. ¶ 58. Consumers can sell excess electricity that they obtain from photovoltaics to a utility company. Xie Decl. ¶ 7.

Solar technology consumers generally choose to use either a solar thermal collector, a photovoltaic system or some combination of the two. Reed Decl. ¶ 61. Some of Plaintiffs' advertisements contain a comparison of the efficiency and cost of their solar collectors to that of photovoltaic systems. Id. at ¶¶ 59-60.

While Plaintiffs do not currently manufacture photovoltaic cells or modules, Plaintiffs have developed a hybrid product that combines both technologies into a single unit. Id. at ¶ 61; Mot. at 14. This product was recognized by Popular Science magazine in June 2000 in an article in which SunEarth, Inc. was described as "one of the largest producers of solar collectors in the United States." Id. at ¶¶ 61, 84, Ex. 17. In June 2003, Plaintiffs also began selling rail mounting systems for generic photovoltaic modules under the product name SunEarth CompRail. Reed Decl.

1  ¶¶ 8, 89, Ex. 22.  In that same year, they received media

2  attention after their solar collectors were installed on the White

3  House.  Reed Decl. ¶¶ 9, 72, Ex. 3.

4       Plaintiffs continue to enjoy success and recognition in their

5  field.  Plaintiffs have submitted a declaration by the company

6  president, Richard Reed, stating that, under the trade name

7  SunEarth, they have sold more than $80 million worth of solar

8  collectors and related products since 2000 in forty-nine states,

9  including California and Texas, about $14 million of which was in

10 California alone.  Reed Decl. ¶ 5; Reed Reply Decl. ¶ 8.  About

11 $6.8 million of the sales in California took place between 2000

12 and 2007 (about $5 million between 2000 and 2006), and sales

13 figures have been increasing since 2000.  Reed Reply Decl. ¶ 9

14 (containing sales figures by year).  Plaintiffs have also provided

15 a 2008 magazine article recognizing that they sold thirty-nine

16 percent of all solar thermal collectors sold in the United States

17 during 2007, a figure corroborated by Reed.  Reed Reply at ¶ 10,

18 Ex. 40.  The company was profiled in the Winter 2010 issue of

19 Energy Leaders Today.  Reed Decl. ¶ 78, Ex. 11.  Plaintiffs'

20 website receives over 3,400 visitors per month and they spend

21 approximately $66,000 per year in advertising and marketing costs.

22 Reed Decl. ¶ 64.

23      Defendant Sun-Earth Solar Power Co., Ltd. (SESP) was first

24 established in 1966 as Ningbo Solar Electric Company, a

25 state-owned company in Ningbo, China.  Xie Depo. 61:4-19.  In

26 1978, the company began selling solar products to the public in

27 China under the brand name Sun Earth.  Id. at 61:22-63:2.  The

28 company was known as Ningbo Solar Electric Power Co., Ltd. from

1999 through 2010, when its name was changed to SESP.  Answer
¶ 26; Reed Decl. ¶ 77, Ex. 10.  In January 2010, Defendant NBSolar
USA, Inc. was formed as a California corporation affiliated with
SESP.  Answer ¶ 4; Xie Decl. ¶ 16.

On October 14, 1996, Ningbo Solar obtained a trademark in
China for the following mark:



Xie Depo. 63:6-64:18.  The Chinese characters translate "verbatim
into English" as "the sun and the earth."  Id.

Ningbo Solar (now, SESP), still based in China, currently
sells photovoltaic systems only.  Xie Decl. ¶ 4; Answer ¶ 3.
Plaintiffs' CompRail product can be used to mount Defendants'
photovoltaic modules.  Reed Decl. ¶ 8.  Defendants began marketing
their photovoltaic panels outside of China in 2004.  Xie Depo.
64:19-23.  Currently, the vast majority of Defendants' business
comes from international utility markets, with about 80% of their
business in Europe, about 15% in China and about 1% in the United
States.  Xie Decl. ¶ 12.

Starting in 2004, Ningbo Solar applied for, and obtained,
trademark protection in several countries, including Germany,
Australia, and China, for a mark that consisted of a circle above
a horizontal line above the words "Sun-Earth" (hereinafter,
Defendants' mark), as follows:

4



Rutt Decl. ¶¶ 5-6, Exs. D-F; Xie Decl. ¶¶ 14-15.

Ningbo Solar entered the United States photovoltaics market in 2004.  Xie Decl. ¶ 14.  In their supplemental reply, Defendants argue for the first time that Ningbo Solar began making sales in the United States as early as 2007.  Defs.' Suppl. Brief 7. Defendants provide four invoices from 2007 showing shipments to buyers within the United States from the company's address in Ningbo, China; the earliest such invoice has a date of April 27, 2007.  Foster Decl. ¶¶ P, Exs. S-V.  The invoices contain Defendants' Sun-Earth mark.  Id.[1]

On July 5, 2006, Ningbo Solar filed an application with the United States Patent and Trademark Office (USPTO) to trademark its Sun-Earth mark.  Reed Decl., Ex. 12 at 1.  On October 2, 2007, the USPTO issued a letter regarding the application, warning, "You filed the trademark application identified below based upon a bona fide intention to use the mark in commerce.  You must use the mark in commerce and file a State of Use . . . before the USPTO will register the mark."  Id. at 7.  USPTO deemed the application

---

[1] Defendants also submit new evidence that they state shows that Ningbo Solar's sales in the United States were $1.5 million in 2007, $7.4 million in 2008, $2.8 million in 2009, $12.6 million in 2010, and $8.3 million in 2011.  Defs.' Suppl. Brief 7. However, the documents to which they cite are not authenticated and consist of lists of years and amounts of money, with no explanation.  Further, there is no evidence provided that these purported sales were done in conjunction with the Sun-Earth mark.

United States District Court
For the Northern District of California

abandoned on April 3, 2008, after Ningbo Solar failed to file a statement of use.  Id. at 5.

In September 2007, Plaintiffs and Defendants attended a trade show in Long Beach, California.  Defendants were listed in the official program as "Ningbo Solar Electric Power."  Reed Third Decl. ¶ 4, Ex. 42, at 47.  Plaintiffs were listed as "SunEarth, Inc."  Id. at 53.  A Ningbo representative noticed that Plaintiffs' company name was the same as the name on Ningbo's mark and visited Plaintiffs' booth, where he exchanged business cards with Plaintiffs.  Xie Depo. 75:19-76:7.  Defendants were a "Megawatt" sponsor of the show and their "nbsolar" mark, depicted below, appeared in the official printed program that was distributed at the show:



Reed Third Decl. ¶ 4, Ex. 42, at 18.[2]  Defendants' Sun-Earth mark appeared on the website for the show in the list of sponsors for a

---

[2] Defendants assert in their supplemental brief that their Sun-Earth mark appeared in the official program for the 2007 show and that Plaintiffs' witness, Richard Reed, had admitted this during the deposition.  Defs.' Suppl. Brief 1-2.  However, the deposition testimony to which they cite does not support that Reed made such an admission.

(cont.)

United States District Court
For the Northern District of California

period of time, until the nbsolar mark was substituted for the Sun-Earth mark several months before the conference took place. Proffitt Decl. ¶¶ 3-11, Exs. 47-51.

On December 12, 2008, Ningbo Solar filed a second application to trademark the Sun-Earth mark with the USPTO, alleging as its filing basis that it had a bona fide intention of using the mark in commerce pursuant to 15 U.S.C. § 1051(b). Reed Decl. ¶ 80, Ex. 13 at 3, 53. This application was assigned Serial No. 77632347. Id. at 3. In August 2010, Ningbo Solar filed a declaration attesting that the Sun-Earth mark was first used in commerce in the United States "at least as early as 07/02/2010." Answer ¶ 25; Reed Decl. ¶ 80, Ex. 13 at 17-20. On December 7, 2010, the USPTO granted Ningbo Solar's application and issued it Trademark Registration No. 3,886,941 for the Sun-Earth mark. Id.[3]

---

Defendants offer Exhibit N, which they claim is the official program of the show. Plaintiffs object to this evidence. Defendants have not authenticated this exhibit in any way. Further, Plaintiffs also offer evidence that Exhibit N is in fact not the official program and is instead a print-out of an early version of the sponsor list from the show's website and that Defendants' symbol was changed to the nbsolar mark by May 2007, four months before the show. Plaintiffs also submit a copy of the official printed program from the 2007, authenticated by Reed who received it at the show. This program contains the nbsolar mark, not the Sun-Earth mark. Reed Third Decl. ¶ 4, Ex. 42, at 18

Accordingly, the Court SUSTAINS Plaintiffs' objection to Defendants' Exhibit N.

[3] Plaintiffs request that the Court take judicial notice of certain documents from the USPTO's files related to this application. Because Defendants do not oppose Plaintiffs' request and the existence of this application and documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the Court GRANTS Plaintiffs' request.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

     In January 2010, Defendant NBSolar USA Inc. was formed as a
California corporation.  Answer ¶ 4; Xie Decl. ¶ 16.  Defendants
describe NBSolar as affiliated with SESP but deny that NBSolar is
a wholly-owned subsidiary of SESP.  Answer ¶ 4; Xie Decl. ¶ 17-18.
The President of the North American Sales Unit for SESP also
serves as the President of NBSolar and worked at SESP prior to the
incorporation of NBSolar.  Xie Decl. ¶¶ 1-2.

     Defendants own several domain names containing SunEarth.
Defendants registered the domain name sun-earth.com in 2004.  Xie
Decl. ¶ 15; Answer ¶ 29.  In 2010, Defendants registered the
domain names SunEarthPower.com and SunEarthPower.net.  Answer
¶ 29.  At some point, Defendants also registered the domain name
SunEarth.us.  Compl. ¶ 29; Answer ¶ 29.  Defendants' website
indicates that "'Sun-Earth' is known as 'Nbsolar' in the United
States.  Both [b]rands are belonged [sic] to the same company Sun
Earth Solar Power Co., Ltd. (formerly Ningbo Solar Electric Co.,
Ltd.) with headquarter [sic] located in Ningbo."  Urbalejo Decl.
¶ 6; Reed Decl. ¶ 77, Ex. 10.

     On December 24, 2009, Plaintiffs filed an application with
the USPTO seeking to trademark SUNEARTH.  USPTO Serial No.
77900886, File Entry No. 3.[4]  On March 23, 2010, Plaintiffs'
trademark application was "suspended pending the disposition of
. . . Application Serial No(s). 77632347."  USPTO Serial No.
77900886, File Entry No. 5.  At the time, Plaintiffs' president

---

     [4] Because the application and documents filed in USPTO
Application Serial Nos. 77900886 are "capable of accurate and
ready determination by resort to sources whose accuracy cannot
reasonably be questioned," the Court takes judicial notice of
them.

understood the suspension to be because "the office was analyzing another pending application with a similar name."  Reed Depo. 104:3-12.

Defendants used the nbsolar mark within the United States until late 2010.  Xie Decl. ¶ 16.  Sometime in 2010, Ningbo Solar changed its name to Sun Earth Solar Power Co., Ltd., (SESP) and subsequently assigned the U.S. trademark for the Sun-Earth mark to SESP.  Answer ¶ 26.  Starting in late 2010, Defendants began prominently using the Sun-Earth mark within the United States. Xie Decl. ¶ 17.

On January 18, 2011, an organizer for a solar power trade show in Colorado sent Plaintiffs an email asking what logo they wanted used for SunEarth in the conference program, suggesting Plaintiffs' logo or Defendants' Sun-Earth mark.  Id. at ¶ 87, Ex. 20; Bliss Decl. ¶ 4.  On July 6, 2011, a trade show organizer asked Plaintiffs' employee, "which SunEarth are you?"  Id. at ¶ 66.

Defendants registered for the Intersolar North America Conference held in San Francisco, California in July 2011 as "Sun Earth Solar Power/Nbsolar USA."  Answer ¶ 30; Reed Decl. ¶ 16.  At Defendants' booth, the Sun-Earth mark was prominently displayed in a number of places in large print.  Id. at ¶ 88, Ex. 21.  At this conference, at least seven actual or potential customers "indicated confusion . . . in words or substance" to Plaintiffs' company president, Richard Reed, regarding whether Plaintiffs were affiliated with Defendants' company.  Id. at ¶ 66.  Several current or potential customers also expressed similar sentiments

United States District Court
For the Northern District of California

9

1    to another of Plaintiffs' employees, with one stating, "I thought
2    you guys had changed your logo."  Bliss Decl. ¶ 6.

3       Defendants registered for the Solar Power International
4    conference in Dallas, Texas in October 2011 under the Sun-Earth
5    mark.  Answer ¶ 31; Reed Decl. ¶ 17; Urbalejo Decl. ¶ 4, Ex. 33.
6    At the Dallas conference, this symbol was displayed prominently at
7    Defendants' booth.  Reed Decl. ¶ 94, Ex. 27.

8       On April 1, 2011, Plaintiffs filed a Petition with the
9    USPTO's Trademark Trial and Appeal Board (TTAB), seeking
10   cancellation of the registration of Defendants' trademark of the
11   Sun-Earth mark.  Reed Decl. ¶ 14; Sunearth, Inc. v. Sun Earth
12   Solar Power Co., Ltd., Proceeding No. 92053829 (T.T.A.B.), Docket
13   No. 1.[5]

14      On June 13, 2011, Plaintiffs sent Defendants a demand letter
15   asking them immediately to cease using the Sun-Earth mark in their
16   business operations within the United States.  Mosier Decl. ¶ 3,
17   Ex. 28.  The parties subsequently entered into a litigation
18   standstill agreement covering both the pending case before the
19   TTAB and potential civil litigation for the time period between
20   June 13, 2011 through October 10, 2011, in order to allow for
21   settlement negotiations to take place.  Mosier Decl. ¶¶ 4, 6, Exs.
22   29, 31.  Among other items, the agreement provided that, in
23   connection with any subsequent motion for a preliminary or
24   permanent injunction by Plaintiffs, Defendants would not assert or

25        [5] On November 10, 2011, the TTAB, with consent of the
26 parties, suspended the proceedings before it pending the final
disposition of the case before this Court.  See Sunearth, Inc. v.
27 Sun Earth Solar Power Co., Ltd., Proceeding No. 92053829
(T.T.A.B.), Docket No. 13.
28

rely upon that time period to argue that delay or prejudice had occurred. Id. In their case management statement, submitted to this Court on January 26, 2012, the parties state that they "agree that the time period of the standstill agreement, from June 13, 2011 to October 10, 2011 should not count towards any period of delay." Docket No. 55, at 7.

The parties did not reach an agreement during their litigation standstill and Plaintiffs initiated this trade name and trademark infringement action on October 11, 2011, the day after the expiration of the standstill agreement. Docket No. 1; Mosier Decl. ¶ 6, Ex. 31. Plaintiffs allege that Defendants have misappropriated and infringed upon Plaintiffs' "Sun Earth" trademark, service mark and trade name. They bring claims against Defendants for trade name infringement, unfair competition, cybersquatting and cancellation of trademark registration under sections 37 and 43 of the Lanham Act, 15 U.S.C. §§ 1119, 1125, trade name infringement in violation of California Business and Professions Code §§ 14415 and 14402, and common law unfair competition and trademark infringement. Plaintiffs filed the instant motion for a preliminary injunction on November 30, 2011. See Docket No. 25.

LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008).

**United States District Court**
For the Northern District of California

1   Alternatively, "a preliminary injunction could issue where

2   the likelihood of success is such that serious questions going to

3   the merits were raised and the balance of hardships tips sharply

4   in plaintiff's favor," so long as the plaintiff demonstrates

5   irreparable harm and shows that the injunction is in the public

6   interest. <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d

7   1127, 1131 (9th Cir. 2011) (citation and internal quotation and

8   editing marks omitted).

9      A court employs a sliding scale when considering a

10  plaintiff's showing as to the likelihood of success on the merits

11  and the likelihood of irreparable harm. <u>Id.</u> "Under this

12  approach, the elements of the preliminary injunction test are

13  balanced, so that a stronger showing of one element may offset a

14  weaker showing of another." <u>Id.</u>

15                           DISCUSSION

16  I.   Chance of Success on the Merits

17     To prevail on a claim of trademark or trade name infringement

18  under the Lanham Act or common law, a plaintiff "must prove:

19  (1) that it has a protectible ownership interest in the mark; and

20  (2) that the defendant's use of the mark is likely to cause

21  consumer confusion." <u>Network Automation, Inc. v. Advanced Sys.</u>

22  <u>Concepts</u>, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting <u>Dep't of</u>

23  <u>Parks & Rec. v. Bazaar Del Mundo, Inc.</u>, 448 F.3d 1118, 1124 (9th

24  Cir. 2006)).

25

26

27

28

United States District Court
For the Northern District of California

1    While "[t]rademarks and trade names are technically

2    distinct,"[6] they are accorded "the same broad level of protection"

3    and infringement of both is analyzed under practically

4    indistinguishable standards.  Accuride International, Inc. v.

5    Accuride Corp., 871 F.2d 1531, 1534-1536 (9th Cir. 1989).

6    Similarly, "service marks and trademarks are governed by identical

7    standards and thus like with trademarks, common law rights are

8    acquired in a service mark by adopting and using the mark in

9    connection with services rendered."  Chance v. Pac-Tel Teletrac,

10   Inc., 242 F.3d 1151, 1156 (9th Cir. 2001) (citations omitted).

11   See also American Steel Foundries v. Robertson, 269 U.S. 372, 380

12   (1926) ("Whether the name of a corporation is to be regarded as a

13   trade-mark, a trade name, or both, is not entirely clear under the

14   decisions.  To some extent, the two terms overlap. . . . But the

15   precise difference is not often material, since the law affords

16   protection against its appropriation in either view upon the same

17   fundamental principles.") (citations omitted).

18   A. Protectible ownership interest

19       Both registered and unregistered trade names and trademarks

20   are protected under the Lanham Act.  Halicki Films, LLC v.

21   Sanderson Sales and Mktg., 547 F.3d 1213, 1225-26 (9th Cir. 2008);

22   see also GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205

23   n.3 (9th Cir. 2000) (noting that "the same standard" applies to

24   infringement claims, irrespective of whether the marks or names

25   are registered).

26   ──────────────

27       [6] Under the Lanham Act, trademarks refer to the words or
     symbols used to identify and distinguish particular goods; service
     marks refer to those used for services; and trade names refer to
28   those used for a business or enterprise.  See 15. U.S.C. § 1127.

United States District Court
For the Northern District of California

"It is axiomatic in trademark law that the standard test of ownership is priority of use." Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219 (9th Cir. 1996). When proving ownership, "[f]ederal registration of a trademark 'constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark' in commerce." Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006) (quoting Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999)). Defendants registered their Sun-Earth mark with the USPTO through an application filed on December 12, 2008, and are therefore entitled to a presumption of ownership for this date. See Sengoku Works, 96 F.3d at 1219 ("the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration"); Rolley, Inc. v. Younghusband, 204 F.2d 209, 211 (9th Cir. 1953) ("Upon registration the presumption as to date of first use by the registrant has been held to extend back to the filing date").[7]

---

[7] Defendants state that they "first applied for" registration of the trademark "in 2006." Opp. at 4. However, while they filed their first application on July 5, 2006, they abandoned that application, Reed Decl., Ex. 12, and are not entitled to a presumption of ownership dating to the date of filing of that application.

Further, though Defendants repeatedly point to 2003 as the earliest time that they used the Sun-Earth mark outside of the United States, see, e.g., Opp. at 3, this is irrelevant to their ownership interest in the mark within the United States. See J. McCarthy, Trademarks and Unfair Competition, § 26:5 n.1 (stating that "first use outside the United States does not count," and explaining, "The concept of territoriality is basic to trademark law. Rights accrue in each nation only by use or fame of the mark in that nation.").

14

**United States District Court**
For the Northern District of California

However, "the non-registrant can rebut this presumption by showing that . . . he used the mark in commerce first." Sengoku Works, 96 F.3d at 1220.  Plaintiffs argue that they have used SunEarth as a trademark, trade name and service mark in the United States since 1978.  Mot. at 10.

Defendants concede that Plaintiffs have shown they used SunEarth as a trade name, see Opp. at 12, but do not address whether Plaintiffs used it as a service mark and dispute whether Plaintiffs used it as a trademark.  Given that Plaintiffs have asserted causes of action based on infringement of all three, Defendants' explicit concession supports at least one basis of liability.  Further, this concession could support cancellation of Defendants' trademark.  See 15 U.S.C. § 1052(d) (providing authority to reject trademark registrations that "[c]onsist[] of or comprise[] mark[s] which so resemble[] . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive") (emphasis added).

Plaintiffs argue that they in fact used SunEarth as both a trade name, referring to the company, and a trademark, referring to particular products, prior to 2007.  See Accuride, 871 F.2d at 1534 ("Trade names often function as trademarks or service marks as well.").  Among other things, Plaintiffs state that they used SunEarth as a housemark in selling the "SunEarth Empire" since 1987, the "SunEarth Copperheart" since 1992, the "SunEarth SunSiphon" since 1994, and the "SunEarth CompRail" since 2003. Reed Decl. ¶ 8.

Although Defendants argue that Plaintiffs' use of SunEarth alongside other product marks means that SunEarth is only a trade name, "it is well established that a product can bear more than one trademark, that each trademark may perform a different function for consumers and recipients of the product." Amica Mutual Insurance Company v. R. H. Cosmetics Corp., 204 U.S.P.Q. 155, 161 (T.T.A.B. 1979).  This frequently occurs when a company uses "a house mark which normally serves to identify the source of the product, per se, and a product mark which serves to identify a particular product within a line of merchandise normally associated with and distinguished by the house mark."  Id.

The determination of whether a trade name is also used as a service mark or trademark "is frequently not easy to make" and "is highly fact specific."  J. McCarthy, Trademarks and Unfair Competition § 9:14-15.  It "is determined from the manner in which the name is used and the probable impact thereof upon purchasers and prospective customers."  In re Univar Corp., 20 U.S.P.Q.2d 1865, 1866 (T.T.A.B. 1991).

Plaintiffs have demonstrated that they are likely to succeed in establishing that they used SunEarth as a protected house mark prior to 2007, based on their specification brochure for the SunEarth CopperHeart series dating to June 2002.  Reed Decl. ¶ 74, Ex. 7.  One of the three uses of SunEarth in the brochure appears to simply identify the company in its corporate form as the creator of the product; in that instance, "SunEarth, Inc." immediately follows the words "Manufactured by" and is followed by the company's address and other contact information.  See id. at 2.  However, the other two instances are not accompanied by such

16

information, and appear to be used to do "more than merely convey information about a corporate relationship." <u>In re Univar Corp.</u>, 20 U.S.P.Q.2d at 1869. While the inclusion of a corporate designator, such as "Inc.," can indicate solely trade name use, <u>see</u> J. McCarthy, <u>Trademarks and Unfair Competition</u> § 9:15, this is not necessarily determinative, especially where, as here, the designator appears in a much smaller font than the mark. <u>See, e.g.,</u> <u>In re Brand Advertising, Inc.</u>, 175 U.S.P.Q. 720 (T.T.A.B. 1972) ("Brand Advertising" depicted above and in much larger letters than "inc" and "ROCKEFELLER BLDG./CLEVELAND, OHIO 44113/(216) 696-4550)); <u>see also</u> <u>Book Craft, Inc. v. BookCrafters USA, Inc.</u>, 222 USPQ 724 (T.T.A.B. 1984) ("BookCrafters" found to be a mark where it appeared in conjunction with the "Inc." corporate designator). In the brochure, "SunEarth" is depicted in distinctively larger, more stylized and bolder characters than the remainder of the document and, as such, appears to have a greater impact upon potential purchasers than simply conveying the corporate name.

Defendants also challenge whether Plaintiffs will be able to prove that they have legally sufficient market penetration to assert rights over their trade name and mark. "Generally, the senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration. This is determined by examining the trademark user's volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising." <u>Glow Indus. v. Lopez</u>, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002). "Where the trademark

**United States District Court**
For the Northern District of California

1  user has acquired a national reputation associated with its mark,

2  it may assert trademark rights even in areas where it has no

3  sales."  Id. at 983 (citing Champions Golf Club v. Champions Golf

4  Club, 78 F.3d 1111, 1124 (6th Cir. 1996); Golden Door, Inc. v.

5  Odisho, 437 F. Supp. 956, 962 (N.D. Cal. 1977)).

6      Plaintiffs are likely to be able to establish legally

7  sufficient market penetration over their trade name and mark prior

8  to 2007.  Unlike in Glow Industries, the case upon which

9  Defendants rely, Plaintiffs have provided sufficiently specific

10 information to "assist the court in quantifying market

11 penetration, sales levels, growth trends, or the number of people

12 who purchased the company's products in relation to the number of

13 potential customers," Glow Indus., 252 F. Supp. 2d at 984-85,

14 through the declarations of the company president, Richard Reed,

15 and corroborating evidence thereof, including news articles.

16 Based on this information, the Court concludes that Plaintiffs

17 have a reasonable likelihood of success in making a sufficient

18 showing on the merits.

19     Accordingly, the Court finds that Plaintiffs are likely to be

20 able to prove a protectible ownership interest in the trade name

21 and mark that is senior to that of Defendants.

22   B. Likelihood of confusion

23     In determining whether there is a likelihood of confusion, a

24 court is to weigh the following factors: 1) the strength of the

25 mark; 2) proximity of the goods; 3) similarity of the marks;

26 4) evidence of actual confusion; 5) marketing channels used;

27 6) type of goods and the degree of care likely to be exercised by

28 the purchaser; 7) the defendant's intent in selecting the mark;

**United States District Court**
For the Northern District of California

and 8) likelihood of expansion of the product lines.  See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).  The similarity of the marks, proximity of the goods and marketing channels used constitute "the controlling troika in the Sleekcraft analysis."  GoTo.com, 202 F.3d at 1205.  However, the analysis is not to be considered in a mechanical fashion, and instead the importance of each Sleekcraft factor will vary in each particular case.  Brookfield Communs., 174 F.3d at 1055 n.16.

Many of Defendants' arguments in their briefs are aimed at dispelling a notion of a possibility of product confusion, that is, that a potential buyer would mistakenly purchase Defendants' product, believing it to be made by Plaintiffs.  However, "product confusion is not the kind of confusion that is at issue in the usual trademark case," especially where, as here, the products manufactured by the parties are alleged to be in related, though not identical, product areas.  J. McCarthy, Trademarks and Unfair Competition § 23:5, at 42-43.  Instead, the relevant inquiry is into source confusion.  Id.  See also Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 151-52 (9th Cir. 1963) (finding that the relevant question was not whether there was product confusion, but rather "whether the use by [the defendants] of the name 'Black & White' on their beer is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services") (internal quotation marks omitted).

Upon consideration of the Sleekcraft factors, the Court finds that Plaintiffs have demonstrated that they are likely to be able to establish a likelihood of confusion.  See Brookfield Communs., 174

1  F.3d at 1053 ("more precisely, because we are at the preliminary

2  injunction stage, [Plaintiffs] must establish that it is likely to

3  be able to show . . . a likelihood of confusion").

4       1. Proximity of the goods

5       This factor concerns the proximity or relatedness of the good

6  or services represented by the potentially infringing marks.  "For

7  related goods, the danger presented is that the public will

8  mistakenly assume there is an association between the producers of

9  the related goods, though no such association exists."

10  Sleekcraft, 599 F.2d at 341.  The proximity of goods is measured

11  by whether the products are: (1) complementary; (2) sold to the

12  same class of purchasers; and (3) similar in use and function.  Id.

13  at 350.

14       Defendants argue that, because they sell photovoltaic

15  products, which collect electricity that can be sold to the grid,

16  and Plaintiffs do not sell photovoltaic products and instead sell

17  solar collectors, the parties' products are dissimilar, precluding

18  a finding of confusion.  However, Defendants focus on exact

19  identity of products, taking too narrow a view of relatedness.

20  Palantir Techs. Inc. v. Palantir.net, Inc., 2008 U.S. Dist. LEXIS

21  6448, at *14-15 (N.D. Cal.) (use of identical marks likely to

22  cause confusion where plaintiff's and defendant's goods and

23  services were related generally to the computer software industry,

24  even though their "lines of business" were "not identical").

25       Plaintiffs have offered evidence that at least one of their

26  products, the SunEarth CompRail, may be used directly in

27  conjunction with Defendants' products, as a mounting system for

28  the latter.  Reed Decl. ¶¶ 8, 89, Ex. 22.  The SunEarth Solaray

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

water heating system is available with a pump that may be used with an AC current source or with a photovoltaic-powered pump. Id. at ¶ 54.  Further, some customers may choose between the two types of products to lower their energy bills with solar technology or may choose to use both types of products.  Reed Decl. ¶¶ 54-62.  Both create products that are installed in commercial, industrial and home settings; though Defendants do not target home consumers themselves and their primary customers are utility companies, they sell products to installation companies that do and they advertise on their website that their products are used in home systems.  Xie Decl. ¶ 13; Reed Decl. ¶ 57, 77, Ex. 10 at 2.  Within California, both types of products are installed by the same contractors.  See Cal. Code Regs. tit. 16, § 832.46 (defining, for licensing purposes, a "solar contractor" as one who "installs, modifies, maintains, and repairs thermal and photovoltaic solar energy systems").  Plaintiffs have also submitted evidence from the USPTO online trademark database that there are at least fifty-one currently registered marks used to brand both solar panels used to generate heat, like Plaintiffs' solar collectors, and solar panels used to generate electricity, like Defendants' products.  Ballard Decl. ¶ 3, Ex. 2.

Accordingly, this factor weighs in favor of Plaintiffs.

2. Similarity of the marks

The greater the similarity between the two marks at issue, the greater the likelihood of confusion.  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002).  "[L]ess similarity between the marks will suffice when the goods are complementary, . . . the products are sold to the same class of purchasers, . . .

1  or the goods are similar in use and function." <u>Sleekcraft</u>, 599

2  F.2d at 341.

3      This factor also favors Plaintiffs.  Plaintiffs have accused

4  Defendants' Sun-Earth trademark, a combination of a picture design

5  and words, of infringing upon Plaintiffs' trade name (SunEarth,

6  Inc.) and trademark and service mark (SunEarth), which consists of

7  words.  "[I]t is well settled that if a mark comprises both a word

8  and a design, then the word is normally accorded greater weight,

9  because it would be used by purchasers to request the goods."

10 <u>L.C. Licensing, Inc. v. Cary Berman</u>, 86 U.S.P.Q.2d 1883, 2008 WL

11 835278, at *3 (T.T.A.B. 2008).  <u>See also</u> <u>Herbko Int'l v. Kappa</u>

12 <u>Books</u>, 308 F.3d 1156, 1165 (Fed. Cir. 2002) ("The words dominate

13 the design feature.").  While Defendants' mark is somewhat

14 different in appearance, the sound, meaning and appearance of the

15 text are identical.  Further, within the text, both marks have

16 similar capitalizations within the lettering, though Defendants

17 use a hyphen and Plaintiffs do not, and both words sound identical

18 when spoken aloud.

19      3. Strength of the mark

20      "The strength of the trademark is evaluated in terms of its

21 conceptual strength and commercial strength."  <u>Mortgage Elec.</u>

22 <u>Registration Sys. v. Brosnan</u>, 2009 U.S. Dist. LEXIS 87596, at *13

23 (N.D. Cal.) (citing <u>Brookfield Communs.</u>, 174 F.3d at 1058).  <u>See</u>

24 <u>GoTo.com</u>, 202 F.3d at 1207 ("'strength' of the trademark is

25 evaluated in terms of its conceptual strength and commercial

26 strength").

27      In terms of conceptual strength, "[m]arks are often

28 classified in one of five categories of increasing

22

distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998). "The latter three characterizations are inherently more distinctive and, hence, are associated with stronger marks." Mortgage Elec. Registration Sys., 2009 U.S. Dist. LEXIS 87596, at *13 (citing Kendall-Jackson Winery, 150 F.3d at 1047). "Marks that are merely generic or descriptive of a product are not inherently distinctive and must have acquired distinctiveness to warrant protection." Metro Publ'g, Inc. v. Surfmet, Inc., 2002 U.S. Dist. LEXIS 26232, at *25 (N.D. Cal.).

Plaintiffs' mark is at least suggestive and is therefore inherently distinctive. See Brookfield Communs., 174 F.3d at 1058, n.19 ("A suggestive mark conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature."). It is more than descriptive, because it does not "define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." Kendall-Jackson Winery, 150 F.3d at 1047, n.8.

Further, Plaintiffs' trade name and mark have been used for over thirty years to identify their business, and under that name and mark, Plaintiffs have gained national recognition as leaders in their field, which has led to, among other things, their products being installed on the White House. Thus, Plaintiffs' trade name and mark are fairly strong. See Accuride, 871 F.2d at 1536 ("extensive advertising, length of exclusive use, [and]

United States District Court
For the Northern District of California

public recognition" among factors that may strengthen a suggestive mark).

Defendants' argument that the solar market is crowded with names that include the word "Sun" is unavailing and relies on a distorted depiction of the meaning of a crowded market in this context.  As Plaintiffs point out, in all of the cases that Defendants cite, the parties have names that share one word or phrase in common and are otherwise different.  In those cases, where that shared word is a common one in the industry, the plaintiff is not permitted to claim right to all variants on it.  That is factually distinct from the present case, where the disputed words are identical.  Defendants make no argument or showing that the field is crowded with many "SunEarths."  If Defendants were correct in their characterization of a crowded field, Wal-Mart, for example, would not be able to prevent another company from adopting the name Wal-Mart as well, because the retail industry is crowded with stores that have the word "Mart" in their names.

4. Evidence of actual confusion

"Evidence that use of a mark or name has already caused actual confusion as to the source of a product or service is 'persuasive proof that future confusion is likely.'"  Rearden LLC v. Rearden Commerce, Inc., 597 F. Supp. 2d 1006, 1023 (N.D. Cal. 2009) (quoting Sleekcraft, 599 F.2d at 352).  "The focus is confusion with respect to the source of a product or service."  Groupion, LLC. v. Groupon, Inc., 2011 WL 5913992, at *5 (N.D. Cal.) (quoting Rearden, 597 F. Supp. 2d at 1023).  See also Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir.

United States District Court
For the Northern District of California

2002).  "However, actual confusion is hard to prove, so the absence of such evidence is generally not noteworthy."  Rearden, 597 F. Supp. 2d at 1023 (citing Brookfield Communs., 174 F.3d at 1050).  Thus, the importance of this factor "is diminished at the preliminary injunction stage of the proceedings."  Network Automation, 638 F.3d at 1151.

Plaintiffs argue that actual confusion has already occurred. "The critical determination for finding a likelihood of confusion is whether prospective purchasers are likely to be deceived, regardless of the experiences of vendors, industry insiders, and job-seekers."  Rearden, 597 F. Supp. 2d at 1023, 1023 n.9 (stating that, while courts outside of the Ninth Circuit may consider confusion by others relevant, the Ninth Circuit's "precedents clearly hold that the key inquiry is confusion of prospective purchasers").  In addition to several instances of confusion by trade show organizers, Plaintiffs have proffered more than ten examples of actual customer confusion, though there is little detail as to what the prospective or actual customers did or said to evidence confusion.  Because Plaintiffs have proffered some evidence at this early stage of the proceedings, this factor favors them.

5. Marketing channels used

"'Convergent marketing channels increase the likelihood of confusion.'"  Official Airline Guides, Inc., v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993) (quoting Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 606 (9th Cir. 1987)).

Here, Plaintiffs present evidence that the parties sell their products in niche marketplaces including solar products shows,

specialty retailers and trade magazines, and that the parties have recently attended several of the same trade conventions.  Mot. at 18.  Defendants do not dispute this.  Accordingly, this factor favors Plaintiffs.

> 6. Type of goods and the degree of care likely to be exercised by the purchaser

"Low consumer care . . . increases the likelihood of confusion."  Playboy Enterprises, Inc. v. Netscape Communs. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004).  "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . .  When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely.  Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  Sleekcraft, 599 F.2d at 353 (citations omitted).

Plaintiffs acknowledge that both parties sell to "wholesalers, contractors, builders and other solar integrators."  Mot. at 18.  Thus, the level of expertise of purchasers is relatively high.  Further, Plaintiffs acknowledge that that the goods at issue are expensive.  Id.  Accordingly, this factor weighs in favor of Defendants.

> 7. Defendants' intent in selecting the mark

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark."  Brookfield Communs., 174 F.3d at 1059

1   (citing Official Airline Guides, 6 F.3d at 1394 ("When an alleged
2   infringer knowingly adopts a mark similar to another's, courts
3   will presume an intent to deceive the public."); Fleischmann
4   Distilling, 314 F.2d 149 at 157).

5        In their opposition, Defendants argue that Plaintiffs are
6   unable to establish that Defendants intended to deceive when
7   selecting the Sun-Earth mark because Plaintiffs are "unable to
8   offer any evidence that [Defendants] knew of [Plaintiffs] or its
9   use of the SUNEARTH mark or name at the time the mark was selected
10  for international use in 2004."  Opp. at 21.  In their
11  supplemental brief, Defendants further argue that they had used
12  the trademark Sun-Earth since 1978 in China, had registered the
13  Chinese version of the mark in China in 1996 and had used the
14  Sun-Earth mark on several invoices sent to customers within the
15  United States in 2007.  Defs. Suppl. Brief at 7.

16       However, the appropriate inquiry is not what Defendants knew
17  at the time that they selected the mark for use in China or
18  internationally in countries other than the United States.  See J.
19  McCarthy, Trademarks and Unfair Competition, § 26:5, n.1.  When
20  Defendants entered the United States market, they consciously and
21  deliberately chose to establish a separate mark using the word
22  nbsolar within the United States, instead of the mark that they
23  were using elsewhere in the world, and abandoning any sporadic and
24  isolated use of the mark in which they had engaged in 2007.
25  Indeed, they continue to state on their webpage that "'Sun Earth'
26  is known as 'NB Solar' in the USA."

27       Instead, the appropriate inquiry is into Defendants' intent
28  in switching from the use of the nbsolar mark to the use of the

27

**United States District Court**
For the Northern District of California

1  Sun-Earth mark, which their representative admits happened in

2  2010.  Xie Decl. ¶ 17.  Before they did so, Defendants had actual

3  knowledge of Plaintiffs' existence and their use of the Sun Earth

4  mark and name, as demonstrated by Defendants' testimony of their

5  observations and interaction at the 2007 trade show.

6        Accordingly, this factor favors Plaintiffs.

7          8. Likelihood of expansion of the product lines

8        "Inasmuch as a trademark owner is afforded greater protection

9  against competing goods, a 'strong possibility' that either party

10 may expand his business to compete with the other will weigh in

11 favor of finding that the present use is infringing."  <u>Sleekcraft</u>,

12 599 F.2d at 354.  "When goods are closely related, any expansion

13 is likely to result in direct competition."  <u>Id.</u>

14       Here, Plaintiffs have submitted evidence that they have

15 engaged in some expansion into the photovoltaic market.  While

16 they are not currently selling photovoltaics, Plaintiffs have

17 developed a hybrid photovoltaic thermal array that combines both

18 technologies into the same unit.  Reed Decl. ¶ 61.  <u>See also</u> <u>id.</u>

19 at ¶ 84, Ex. 17 (article in Popular Science magazine describing

20 the development and discussing the advantages of Plaintiffs'

21 hybrid unit).

22       Defendants have not directly addressed this factor, though

23 they do state that there is virtually no overlap in the skills,

24 methods or materials used to manufacture the two types of products

25 and that the manufacture of photovoltaics require "rare

26 technological know-how."  Opp. at 5.  However, as discussed,

27 Plaintiffs have already provided evidence that they do have the

28

United States District Court
For the Northern District of California

skills, methods and technical knowledge to enter the photovoltaics
market and that they have in fact been innovative in it.

Accordingly, this factor favors Plaintiffs.

C. Defendants' Laches Defense

Defendants bear the burden of showing that an affirmative
defense is likely to succeed.  See Marlyn Nutraceuticals, Inc. v.
Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009)
("[O]nce the moving party has carried its burden of showing a
likelihood of success on the merits, the burden shifts to the
nonmoving party to show a likelihood that its affirmative defense
will succeed.")(quoting Perfect 10, Inc. v. Amazon.com, Inc., 508
F.3d 1146, 1158 (9th Cir. 2007); Gonzales v. O Centro Espirita
Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006)).

"Laches is an equitable defense to Lanham Act claims."
Internet Specialties West, Inc. v. Milon-Digiorgio Enters., 559
F.3d 985, 989 (9th Cir. 2009) (citing GoTo.com, 202 F.3d at 1209).
"This defense embodies the principle that a plaintiff cannot sit
on the knowledge that another company is using its trademark, and
then later come forward and seek to enforce its rights."  Id. at
989-90 (citing Grupo Gigante S.A. de C.V. v. Dallo & Co., 391 F.3d
1088, 1102-03 (9th Cir. 2004)).

"The test for laches is two-fold: first, was the plaintiff's
delay in bringing suit unreasonable? Second, was the defendant
prejudiced by the delay?" Id. at 990 (citing Jarrow Formulas,
Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002);
Tillamook Country Smoker, Inc. v. Tillamook County Creamery
Association, 465 F.3d 1102, 1108 (9th Cir. 2006)).  To determine
if plaintiffs have acted diligently, a court must determine if

**United States District Court**
For the Northern District of California

they filed suit within the applicable statute of limitations period, "thereby creating a presumption against laches," or if they filed suit outside of the limitations period, creating a presumption that "laches is applicable." Id. (citing Jarrow, 304 F.3d at 835-36).  In a trademark case, "the limitations period for laches starts from the time that the plaintiff knew or should have known about its potential cause of action."  Id. at 986.

Because "[t]he Lanham Act contains no explicit statute of limitations," a court borrows the statute of limitations from an analogous state law.  Jarrow, 304 F.3d at 836.  Defendants concede that the "presumption of laches for trademark infringement in California applies after [a] four-year delay."  Opp. at 9, 9 n.3. See Internet Specialties West, 559 F.3d at 990 n.2 ("Neither party disputes the imputation of the four-year limitations period from California trademark infringement law, and we agree that this was the correct period to use.").

Because the standstill agreement began on June 13, 2011, the first question is whether Plaintiffs had reason to know of Defendants' use of their name and mark prior to June 13, 2007, giving rise to a presumption of laches.  Here, the only argument that Defendants make is that Plaintiffs had notice because Defendants registered the domain name sun-earth.com.  However, it is currently uncontested that Defendants legitimately engage in business outside of the United States under the Sun-Earth mark. Accordingly, mere registration of a domain name that can be used for international business does not provide Plaintiffs with clear notice that Defendants are illegitimately infringing on their mark or name within the United States.  Further, there is evidence in

30

**United States District Court**
For the Northern District of California

the record that Defendants state on their homepage that they in fact do not do business within the United States under the Sun-Earth name, and that they instead go by NBSolar within the United States.  Thus, Defendants' website does not give warning to Plaintiffs that Defendants used their name and mark within the United States.  Finally, the Ninth Circuit has recognized that mere registration of a domain name may be too minimal an encroachment to support a finding of laches, where the defendant did not engage in infringing activity using the domain name for a period of time after registration.  See Brookfield Communs., 174 F.3d at 990.  Here, Defendants have offered no evidence or allegation that they have used the webpage in an encroaching manner since 2004 and only argue that they registered it at that time.

Further, "[a]ll courts are very reluctant to deny injunctive relief because of plaintiff's delay when it appears that defendant knowingly and deliberately adopted the mark charged as an infringement."  J. McCarthy, Trademarks and Unfair Competition § 31:9.  See also Danjaq LLC v. Sony Corp., 263 F.3d 942, 956 (9th Cir. 2001) ("Laches does not bar a suit against a deliberate infringer.  This principle appears to be based on the equitable maxim that 'he who comes into equity must come with clean hands[.]'").  Because Plaintiffs have established that they are likely to be able to prove that Defendants adopted their name and mark within the United States knowing of Plaintiffs' prior claims and because it is likely that there will be a presumption against laches in this case, Defendants are unlikely to be able to raise a defense of laches successfully.

31

**United States District Court**
For the Northern District of California

1   II.   Likelihood of Irreparable Harm

2        While Defendants argue that Plaintiffs have not proven that

3   they will suffer economic harm or harm to their reputation,

4   Defendants cite only cases in which the plaintiffs had not

5   established a likelihood of success on the merits, or to

6   non-trademark infringement cases.  See, e.g., Rodan & Fields, LLC

7   v. Estee Lauder Companies, Inc., 2010 WL 3910178, at *6 (N.D.

8   Cal.) (plaintiffs failed to establish a likelihood of success on

9   the merits); Jupiter Housing, Inc. v. Jupitermedia Corp., 2004 WL

10  3543299, at *6 (N.D. Cal.) (same); Givemepower Corp. v. Pace

11  Compumetrics, Inc., 2007 WL 951350 (S.D. Cal.) (no claim for

12  trademark infringement in the operative complaint).

13       Defendants argue that, in light of the Supreme Court's

14  decision in Winter v. Natural Res. Def. Council, Inc., 129 S. Ct.

15  365 (2008), Plaintiffs must make an affirmative showing of

16  irreparable harm in trademark infringement cases.  See Edge Games,

17  Inc. v. Elec. Arts, Inc., 745 F. Supp. 2d 1101, 1117 (N.D. Cal.

18  2010).

19       Previously, a plaintiff in a trademark case was entitled to a

20  presumption of irreparable harm upon showing a probable success on

21  the merits.  See GoTo.com, 202 F.3d at 1204-05.  However, the

22  continuing vitality of this presumption in trademark infringement

23  cases is not clear.  After Winter, in at least one case, the Ninth

24  Circuit has upheld a district court's application of its prior

25  precedent that, "[i]n a trademark infringement claim, 'irreparable

26  injury may be presumed from a showing of likelihood of success on

27  the merits.'"  Marlyn Nutraceuticals, Inc., 571 F.3d at 877

28  (quoting El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1038 (9th

United States District Court
For the Northern District of California

Cir. 2003); GoTo.com, 202 F.3d at 1205 n.4) (formatting in original).  However, in an analogous copyright infringement case, another Ninth Circuit panel has said that "the summary treatment of the presumption" in Marlyn Nutraceuticals "does not . . . constitute an affirmation of the presumption's continued vitality."  Flexible Lifeline Sys. v. Precision Lift, Inc., 2011 U.S. App. LEXIS 17462, at *998 (9th Cir. 2011).  While the Ninth Circuit has not yet directly addressed the effect of Winter upon the presumption of irreparable harm in the trademark infringement context, it has found that the analogous presumption in the copyright infringement context has effectively been overturned in light of Winter and eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).  See id. at *999; Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 978-981 (9th Cir. 2011).

Regardless of whether they are also entitled to a presumption of irreparable harm, Plaintiffs have made an affirmative showing that they are likely to suffer irreparable harm in the absence of an injunction.  Plaintiffs have introduced evidence that customers and others have evidenced actual confusion between the marks and names of the two companies.  Further, Defendants admit that Plaintiffs have no control over Defendants' products and the quality thereof.  "The Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm for purposes of preliminary injunctive relief."  Mortgage Elec. Registration Sys. v. Brosnan, 2009 U.S. Dist. LEXIS 87596, at *24 (N.D. Cal.) (citing Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001); Apple Computer, Inc.

**United States District Court**
For the Northern District of California

1  v. Formula Int'l Inc., 725 F.2d 521, 526 (9th Cir. 1984)).  As

2  previously discussed, the record supports that Plaintiffs have

3  invested significant time in building up a strong reputation over

4  the course of several decades.  The potential misidentification

5  poses a serious threat to this goodwill and reputation.

6      Defendants argue that, because Plaintiffs were willing to

7  engage in settlement negotiations with them and to discuss the

8  possibility of a monetary settlement, money damages would be

9  adequate to compensate them for any harm.  However, the fact that

10  Plaintiffs were willing to discuss settlement to avoid litigation

11  does not by itself demonstrate the adequacy of monetary damages.

12      Defendants also argue that Plaintiffs delayed unreasonably in

13  bringing this action and in filing a motion for a preliminary

14  injunction after initiating the action.  The earliest time that

15  the record suggests Plaintiffs learned of Defendants' claim to the

16  Sun-Earth mark was the date of the letter sent by the USPTO on

17  March 23, 2010.  The record also supports that Plaintiffs

18  initiated cancellation procedures in the USPTO on April 1, 2011

19  and sent Defendants a letter demanding that they cease using the

20  Sun-Earth mark on June 13, 2011.

21      As previously stated, unreasonable delay in a trademark

22  infringement case is measured from when the plaintiff knew or

23  should have known about its potential cause of action.  See also

24  Cellularm, Inc. v. Bay Alarm Co., 20 U.S.P.Q.2d 1340, 1346 (N.D.

25  Cal. 1991) (the period of time should begin running when the party

26  had or should have had "reliable information establishing the

27  basis for a claim," because "[a] party may not bring a claim based

28  only on speculation and rumor").  Plaintiffs could not have

brought this action until they knew that Defendants had used their

mark, not based upon the possibility that Defendants might do so.

Further, a party is charged with constructive notice of a mark

when it is placed on the principal register, see 15 U.S.C. § 1072,

not when the application for a trademark is filed.

Defendants argue that Plaintiffs delayed unreasonably by not

filing suit after they were notified by the USPTO about

Defendants' pending application in March 2010.  However, as

Plaintiffs state, Defendants filed that application on the basis

that they intended to use the mark in commerce within the United

States pursuant to 15 U.S.C. § 1051(b), not that they had used it

in commerce pursuant to 15 U.S.C. § 1051(a), and Defendants did

not file a statement claiming they had actually used the mark in

commerce until August 2010.  Thus, there is no evidence that

Plaintiffs would have or should have received notice of

Defendants' use of their mark at the time of the notice.

Accordingly, the delay began when the mark was granted and

published in the primary register on December 7, 2010.

The period of delay does not appear unreasonable.  On April

1, 2011, Plaintiffs initiated the USPTO cancellation proceedings

and shortly after sent a cease-and-desist letter to Defendants, in

an attempt to avoid resort to judicial intervention.  The parties

entered into a stop-litigation agreement shortly thereafter.

Especially in light of the intervening settlement negotiations,

this amount of time is not sufficiently unreasonable to preclude a

preliminary injunction, especially given Defendants' knowing

infringement of Plaintiffs' mark.

**United States District Court**
For the Northern District of California

III. Balance of Equities

Balancing of the equities in this case favors Plaintiffs.

Defendants knowingly used the mark in the United States only after learning of Plaintiffs' prior use. See Cadence Design Sys. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) ("a defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities") (internal quotations omitted).

Defendants speculate that an injunction would make it difficult for them to develop future business in the United States with utilities companies; however, they admit that they do not already have these relationships. As Plaintiffs point out, the status quo that a preliminary injunction in a trademark infringement case seeks to protect is "the last uncontested status which preceded the pending controversy," which in this case was before Defendants began using their allegedly infringing trademark. GoTo.com, 202 F.3d at 1210. Defendants are not prevented from developing relationships with the utilities companies using their nbsolar mark; instead, they are only prevented from doing so under Plaintiffs' name and mark.

Defendants also argue that Plaintiffs should not be allowed to enjoin their participation in upcoming international trade show conferences, because "[a]ny large player in the international market needs to exhibit [at these conferences], or else it risks substantial harm to its business." Defs.' Suppl. Brief, at 8. However, Defendants mischaracterize Plaintiffs' motion. Plaintiffs do not seek to prevent them from exhibiting at any conference within this country. Instead, as stated above,

**United States District Court**
For the Northern District of California

1   Plaintiffs seek to prevent them from doing so under Plaintiffs'

2   name and mark.

3   IV.   Public Interest

4        Plaintiffs argue that a preliminary injunction would protect

5   the public interest by preventing confusion of customers through

6   the use of a confusingly similar mark.  See Trafficschool.com v.

7   Edriver Inc., 653 F.3d 820, 827 (9th Cir. 2011) ("the Lanham Act

8   is at heart a consumer protection statute") (citing, among others,

9   Alex Kozinski, Trademarks Unplugged, 68 N.Y.U. L.Rev. 960, 964

10  (1993) ("The great evil the Lanham Act seeks to prevent is that of

11  consumers being duped into buying a watch they later discover was

12  made by someone other than Rolex.")).

13       At the hearing, Defendants acknowledged that preventing

14  customer confusion serves the public interest, and in their

15  papers, Defendants argue only that the public interest would not

16  be served because Plaintiffs have not established a likelihood of

17  confusion.  Because the Court has already found Defendants'

18  arguments regarding a likelihood of confusion unpersuasive, this

19  argument is equally unavailing.

20  V.    Bond

21       Plaintiffs propose a bond of $5,000, which Defendants do not

22  oppose.  Accordingly, the Court finds a bond of this amount to be

23  sufficient and appropriate.

24  VI.   Additional Terms for the Preliminary Injunction

25       The parties are directed to attempt to reach an agreement

26  regarding: (1) reasonable terms for an exception to the current

27  preliminary injunction to allow Defendants to explain within the

28  United States, including at trade shows and conferences, their

affiliation with their Sun-Earth name and mark used outside of the
United States, without creating confusion; and (2) reasonable
terms to add to the current preliminary injunction to provide
referrals for users from the Sun-earth.com, SunEarthpower.com, and
SunEarthpower.net domain names to Defendants' non-infringing
websites, without creating confusion.

Within two weeks of the date of this order, the parties shall
file a stipulation setting forth the agreed-upon terms to be added
to the preliminary injunction.  If the parties are unable to agree
upon reasonable terms, the Court will entertain a single motion by
Defendants proposing language to modify the current injunction to
accomplish this.

Any motion Defendants make for this purpose shall be filed
within three weeks of the date of this order, shall be limited to
ten pages or less, and may not contain proposed modifications
beyond those specified above.  If Defendants file such a motion,
Plaintiffs may file an opposition and alternatives to Defendants'
proposed modifications within a week thereafter; any such
opposition shall be limited to ten pages or less.  Defendants may
file a reply to Plaintiffs' opposition, if any, within three days
thereafter; any such reply shall be limited to three pages or
less.

United States District Court
For the Northern District of California

CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiffs' motion for a preliminary injunction (Docket No. 25).  A preliminary injunction has been entered as a separate document. See Docket No. 60.

IT IS SO ORDERED.


Dated: February 3, 2012

_____
CLAUDIA WILKEN
United States District Judge