1   James J. Foster (Mass. State Bar #553285)
    WOLF, GREENFIELD & SACKS, P.C.
2   600 Atlantic Avenue
3   Boston, MA  02210-2206
    Telephone: 617-646-8000
4   Facsimile: 617-646-8646
    Email: jfoster@wolfgreenfield.com
5
    Attorney for Defendants
6   Sun Earth Solar Power Co., Ltd. and NBSolar USA Inc.

7

8                      UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                          OAKLAND DIVISION

11

12  SUNEARTH, INC., THE SOLARAY            Case No. 11-cv-04991 CW
    CORPORATION,

13          Plaintiffs,                    **DEFENDANTS' DIRECT EXAMINATION**
                                           **OF YUMING DONG**
14      vs.

15  SUN EARTH SOLAR POWER CO., LTD.,
    NBSOLAR USA INC., DOES 1 – 10,
16
            Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

1       I declare under penalty of perjury:

2       1.    I am Senior Marketing and Sales Manager for Defendant Sun Earth Solar Power

3   Co., Ltd. ("SESP"), the parent corporation of Defendant NBSolar USA Inc. ("NBSolar USA").

4   **I.    BACKGROUND**

5       **SESP and Its Worldwide Use of "Sun Earth"**

6       2.    SESP and its predecessor companies have manufactured photovoltaic ("PV")

7   panels in China since 1978.  SESP was the first manufacturer of solar cells and solar panels in

8   China.  By the year 2000, SESP had become a substantial PV panel manufacturer within China.

9   In 2004, SESP began exporting its products, principally to Germany and other countries in

10  Europe.  Today, SESP's manufacturing capacity places it among the world's largest PV panel

11  manufacturers.  In 2011, for example, SESP  had sales of about $410 million and exported its PV

12  panels to more than 60 countries around the world.  Only about 2% of sales, however, were to the

13  United States.

14      3.    Beginning in 1978, SESP's PV panels were branded with the Chinese words for

15  "Sun Earth".  The Chinese version of SESP's "Sun-Earth" brand is famous in China's solar

16  power electricity industry.  In 1996, SESP registered in China the Chinese-language form of

17  "Sun-Earth" as a trademark.

18      4.    In 2004, when it entered international markets, SESP changed the branding on its

19  PV panels from the Chinese to the English version of its "Sun-Earth" trademark.  Most of SESP's

20  international customers have come to know it by the English "Sun-Earth" brand under which it

21  has done business internationally.

22      5.    The Sun-Earth trademark includes the familiar circle and line design symbolizing

23  the sun and the earth ("SUN-EARTH logo"):[1]

24

25

26

27  [1] To avoid confusion, I use "SUN-EARTH logo" to refer to the circle and line design and "Sun-
Earth trademark" to refer to the combination of the SUN-EARTH logo and the words "Sun-

28  Earth."

1

2

3

4

5



6      6.      Prior to 2010, SESP was named "Ningbo Solar Electric Power Co., Ltd," because

7   it was located in Ningbo, China.  That name, however, was more difficult for foreigners to

8   pronounce than "Sun-Earth."  As SESP's presence in the international market grew, we felt that

9   our city name, Ningbo, hindered SESP's growth under the "Sun Earth" brand because it was

10  inconsistent with the name by which most international customers recognized us – namely, "Sun-

11  Earth."  Therefore, in 2010, SESP changed its name from "Ningbo Solar Electric Power Co.,

12  Ltd." to "Sun Earth Solar Power Co., Ltd." to correspond with the "Sun-Earth" brand it had been

13  using for more than 30 years.

14      7.      Changing to the SESP name in 2010 was a time-consuming and expensive process.

15  In China, we were required to obtain the following: approval by the Ningbo Administration for

16  Industry and Commerce; a business license; registration under the new name with tax bureaus,

17  banks and numerous governmental authorities which regulate aspects of SESP's operations,

18  including the Customs Authority, Foreign Exchange Authority, Environmental Protection

19  Authority, and National Land Authority.

20      8.      In addition, due to the large scale of SESP's international operations the effects of

21  the 2010 name change were felt around the world.  For example, substantial company resources

22  were required to ensure that SESP's name change complied with the various legal requirements in

23  the more than 50 countries in which SESP does business.  Despite these costs, SESP invested the

24  time and money required to change its name because it was important to SESP that it project a

25  uniform global brand.

26

27

28

1      **Use of the NBSolar and Sun-Earth Trademarks in the United States**

2      9.      In addition to the Sun-Earth trademark, in 2007 the company had an auxiliary

3      trademark, NBSolar, which was a shortened form of the company's then "Ningbo Solar" name.

4      That mark also included the "SUN-EARTH logo":

5

6

7                                    

8

9

10     Although that trademark has been used to an extent in some countries other than the United States,

11     prior to 2007, SESP had primarily used the Sun-Earth trademark in connection with the sale of its

12     goods internationally.

13     10.      SESP's original sales efforts in the United States in 2006-07 and actual sales in

14     2007 were under the Sun-Earth trademark.  In 2007, however, we regarded the United States as a

15     brand new market for us, with the potential to grow to be the second largest market (after Europe)

16     for PV panels.  Since, at that time, the Sun-Earth trademark was as yet little known in the United

17     States, we decided it would be a good idea for us to promote the NBSolar trademark in that

18     country.

19     11.      In late 2007, we thus phased out the use of the Sun-Earth trademark on goods

20     shipped to the United States in favor of the NBSolar trademark.  That situation continued until the

21     end of 2010.

22     12.      In January 2010, NBSolar USA was formed as a California corporation.  At that

23     time, we were still using, on products shipped to and sold in the United States, the NBSolar

24     trademark pictured above, i.e., the NBSolar portion of the new company's name under the SUN-

25     EARTH logo.

26     13.      When we had started using the NBSolar trademark in the United States in late

27     2007, we had assumed that our global customers would recognize the affiliation of the NBSolar

28     brand with SESP based on the common SUN-EARTH logo.  By 2010, however, we came to

1   realize this had been a mistake.  By not using a uniform, global brand, we had created a risk that

2   utility companies who knew SESP as "Sun-Earth" in the European markets would not recognize

3   the affiliation between SESP and the NBSolar brand.  To avoid this problem and capitalize on the

4   goodwill that we had established globally, in late 2010 we once again began prominently using

5   the same Sun-Earth trademark in the United States that we were using globally.

6       14.     By affiliating SESP's global Sun-Earth trademark with NBSolar USA in the

7   United States, we were hopeful that utility companies in America would associate with NBSolar

8   USA the goodwill that SESP had established with utility companies around the world.

9   **II.      LIKELIHOOD OF CONFUSION**

10          **SESP's Unopposed Registration of the Sun-Earth Mark in the United States**

11      15.     Beginning in 1994, SESP applied for and received trademark registrations for both

12   the Sun-Earth and NBSolar trademarks in numerous countries.  We underwent the expense of

13   these international filings because we wanted assurance that we could use these names in those

14   countries.  We did not want to become involved in trademark disputes.  Rather, we presumed that

15   obtaining a trademark registration from the appropriate governmental authority in a country

16   would give us the right to use the registered trademark there.

17      16.     I have reviewed with our lawyers certain of the files for our United States

18   registration.  Those files showed that in 2006, SESP filed in the United States an application for a

19   registration to the Sun-Earth trademark and design, illustrated in Paragraph 5 above, stating an

20   intent to use that trademark on our products.  Although the United States Trademark Office (the

21   "Trademark Office") allowed the trademark, because a statement of use was inadvertently not

22   filed the Trademark Office deemed that first application  abandoned.  In 2008, SESP re-applied

23   for registration of the Sun-Earth trademark and design.  The Trademark Office conducted a search

24   for conflicting marks (Ex. 66 at 50) and the Sun-Earth trademark was published for opposition

25   twice, first, in July 2007, and then again, in November 2009.  The files show that neither

26   Plaintiffs, nor any other party, opposed registration and that, in December 2010, the Sun-Earth

27   trademark was added to the Principal Register.

28

17.     When the registration issued, we fully believed that we had the right to use the trademark on our goods in the United States.  As noted, after publication twice, no one had objected to such use and, after conducting a search, the United States government had granted our application.

18.     In June 2011, however, several months after SESP had returned to using the Sun-Earth trademark rather than the NBSolar trademark in the United States, and six months after the Trademark Office had granted our unopposed registration, we were surprised to receive notice that Plaintiffs had filed with the Trademark Trial and Appeal Board (TTAB) a petition to cancel SESP's Sun-Earth registration.  At the time we received that unexpected notice, we in good faith expected that, if the matter was not first settled, the Trademark Office would likely reject the petition, on the ground that there was no likelihood of confusion with SunEarth Inc.  SESP's belief was based on: (1) the Trademark Office's different classifications for solar water heating (SWH) and PV industries; (2) the differences between the SWH and PV industries; (3) the care and sophistication of customers; and (4) the absence of any evidence of actual confusion.

**The Trademark Office Classifies Solar Thermal and Photovoltaic Systems Separately**

19.     I understand from our Trademark Office file that the Trademark Office recognizes the difference between SWH and PV systems by categorizing them under separate trademark classifications.  PV systems are classified under Class 9, which includes "apparatus and instruments for conducting, switching, transforming, accumulating, regulating or controlling electricity." (Ex. 73 at 5.)  By contrast, SWH systems are classified under Class 11, which covers "apparatus for lighting, heating, steam generating, cooking, refrigerating, drying, ventilating, water supply and sanitary purposes." (Ex. 73 at 6.)

20.     SESP's registration of the Sun-Earth mark is limited to Class 9.  (Ex. 66 at 5.)  By contrast, and consistent with the Trademark Office's classification scheme, I understand from its filing that Plaintiff Solaray applied to register its logo and the Sun-Earth mark in Class 11, but not in Class 9.  (Exs. 112 & 113 at 10.)

21.     The files show that during our prosecution of the Sun-Earth mark, the Trademark Office rejected SESP's use of "solar panels" in Class 9 to identify its goods "because it is too

1    broad and could include goods in other international classes." (Ex. 66 at 50.) Ironically, the

2    Trademark Office then proposed that SESP change its description to "solar heat collection panels

3    in Class 11." (Ex. 66 at 50.) (The Trademark Office issued a similar rejection to SESP's co-

4    pending application for registration of the NBSOLAR mark. (Ex. 67 at 28.)) Had we accepted

5    that suggestion, then I believe that our registration would have been broad enough to cover

6    Plaintiffs' products.

7        22.    The files show that SESP, however, rejected the Trademark Office's suggestion.

8    As explained in correspondence between SESP's Chinese and United States trademark

9    prosecution counsel, "the examiner attorney misconceived our client products as thermal

10   installation." (Ex. 72 at 6.) Instead, SESP retained the original Class 9 categorization and revised

11   its identification of goods to cover only "solar cells, solar panels, namely photovoltaic panels and

12   photovoltaic modules for the production of electricity; solar controllers, namely, photovoltaic

13   controllers." (Ex. 66 at 49.)

14       23.    The files thus show that we did not seek – and we did not receive – any trademark

15   rights with respect to the solar thermal industry, in which Plaintiff SunEarth conducts its business.

16   The narrow category as to which we sought and received trademark protection does not cover the

17   goods that Plaintiff  SunEarth Inc. sells.

18       24.    After receiving notice of this cancellation proceeding, we attempted to settle the

19   matter with Plaintiffs on the basis of both parties' continuing to use their respective trademarks in

20   their respective industries.  Under our proposal, SESP would confine its use of its United States

21   registered mark to the PV products for which the registration had been granted, and SESP would

22   not oppose SunEarth Inc.'s obtaining a registration for SWH products.  Plaintiff, however,

23   rejected this proposal. (Ex. 21 at 2.)

24          **Differences Between Solar Water Heating and Photovoltaic Industries**

25       25.    We have always regarded the solar water heating industry as entirely separate from

26   the photovoltaic industry.  We have never participated in the SWH business, or anything close to

27   it.  Because we are not in that industry, it has always seemed inconceivable to us that any person

28   in the United States with any knowledge of the PV industry would think that Plaintiff SunEarth

Inc. (assuming that he had even heard of that entity) would have any relationship to the panels that we sell, or to our company. I have reviewed evidence from Plaintiffs, but none suggests anyone would think that our sale of PV products in the United States had some connection with them.

26. Solar energy technologies fall into four main categories:

A) PV systems, which convert sunlight directly to electricity through PV cells;

B) SWH systems, which use a "solar collector" to either heat water directly or heat a working fluid that then heats water;

C) Concentrating Solar Power systems, which use mirrors to concentrate sunlight, thereby producing heat that is used to generate electricity; and

D) Transpired Solar Collectors, which use solar energy to preheat ventilation air in buildings.

27. Defendants sell only PV systems, and are not involved in the SWH market, or the other technologies. I understand that Plaintiffs have testified that, by contrast, under the SunEarth name Plaintiffs market solar collectors and are not involved under that name in the PV systems, or other, markets.

28. Our company has always believed that between the PV and SWH markets, the products differ greatly. A typical PV system consists of five basic components: (1) a PV panel made of many PV cells; (2) an inverter for a system tied to the utility grid or which requires alternating rather than direct current; (3) a charge regulator or controller for stand-alone systems; (4) one or more batteries for stand-alone systems; (5) and wiring. A basic PV system is shown below:

1
2
3
4
5
6
7
8
9



10   29.    By contrast, we understand SWH systems as consisting of a solar collector that

11  faces the sun and absorbs solar energy. The solar collector is simply a box containing pipes

12  through which a liquid is circulated, and heated by exposure to the sun.  Typically, that liquid is

13  an antifreeze mixture that carries the absorbed heat back to a storage tank.  In the storage tank,

14  heat is transferred from the circulating liquid to tap water, which can then be used by consumers.

15  A simple SWH system is portrayed below:

16
17
18
19
20
21
22
23



24   30.    As can be seen, the PV and SWH systems differ fundamentally, performing

25  different functions.  Further, we understand that the solar technologies each function in

26  fundamentally different ways.  PV systems use semiconductors to generate electricity directly

27  from sunlight.  Some PV systems are tied to the utility grid, enabling consumers to effectively sell

28

1    excess electricity.  By contrast, we understand that SWH systems rely on absorption of thermal

2    energy by antifreeze circulating through copper pipes to heat household water supplies, and that,

3    unlike electricity, excess hot water in SWH systems cannot be sold back to the utility company.

4        31.    Also separating the two industries are the different manufacturing processes and

5    technology required to produce PV and SWH systems.  We understand that SWH systems

6    basically involve the production and welding of copper pipes.  PV systems, by contrast, require

7    very different manufacturing processes: purification of silicon raw material; production of silicon

8    wafers; manufacture of solar cells by semiconductor technology; and assembly of PV panels.

9    These processes require expensive equipment and rare technical know-how.  There is virtually no

10   overlap between the skills, methods, or materials used to manufacture solar collectors and PV

11   semiconductors.

12       32.    Although both PV and SWH systems can be broadly classified as "solar energy

13   systems,"  they form entirely separate industries.  I understand that the United States Energy

14   Information Administration categorizes PV and SWH separately, and issues separate surveys to

15   PV and SWH manufacturers.  (Ex. 331.)  I also have learned the United States Customs and

16   Border Patrol also differentiates these two products by allocating a different Harmonized System

17   (HS) codes to them.  The PV HS code is 8541.40.60.20 and the SWH HS code is 8419.19.00.40.

18       33.    I understand that the State of California treats PV and SWH as separate industries.

19   California has separate solar incentive programs for PV and SWH.  (Compare Ex. 332 with Ex.

20   333.)  The California Solar Initiative-Thermal (CSI-Thermal) Program Handbook states that "To

21   receive a CSI-Thermal Program incentive, installed SWH equipment must…have a Solar Rating

22   and Certification Corporation (SRCC) or International Association of Plumbing and Mechanical

23   Officials (IAPMO) OG-300 System Certification." (Ex. 332 at 19-20.)  The requirements for

24   eligible PV systems are set forth in a separate handbook, which states "PV system components

25   (modules, inverters, and system performance meters) must be certified through the California

26   Energy Commission's PV system certification program.  The CEC provides a list of currently

27   certified eligible equipment on the Go Solar California site at

28   http://www.gosolarcalifornia.ca.gov/equipment/".  (Ex. 333 at 107.)  SESP's  name is included in

1   that list, as required by law, but Plaintiffs' name does not appear because they do not manufacture

2   PV equipment.  (Ex. 84.)

3   <u>**The Parties' Customers Are Sophisticated and Distinct from One Another**</u>

4         34.     We manufacture PV products for only three markets: large-scale utility companies;

5   commercial rooftop applications; and residential markets.  The capacity and cost of PV systems

6   for these three markets are roughly:

7               A)     <u>Utility</u>: 5-50 megawatts, costing $25-225 million;

8               B)     <u>Commercial</u>: 100-1,000 kilowatts, costing $600,000 to $5.5 million;

9               C)     <u>Residential</u>: 2-10 kilowatts, costing $12,000 to $80,000.

10        35.     The vast majority of our business comes from international utility markets.  In

11  particular, about 70% of our business is in Europe, about 15% in China and about 3% in the

12  United States.

13        36.     Globally, our primary target is the utility market.  In Europe, about 80% of our

14  business comes from the utility market.  In the United States, however, we were just beginning to

15  develop relationships with utilities.  As a result, about 95% of our United States sales have come

16  from the commercial market.  We do not target residential customers.  The small fraction of our

17  residential business is based on sales to installation companies.

18        37.     Until we grow our PV business in the United States utility market, much of our

19  business will continue to come from commercial rooftop applications.  We do not engage in any

20  business with individual homeowners, which I understand Plaintiff, SunEarth Inc., has testified is

21  its market.  As a result, our customers are sophisticated business persons in the commercial

22  market, or, occasionally, installation companies who install PV systems in residential locations.

23        38.     Although a small fraction of NBSolar's products reach the residential market, I do

24  not think it would be possible for a customer to mistakenly purchase a PV system when intending

25  to purchase a different solar energy system.  A customer would notice the significant cost

26  differences between PV and SWH systems.  As Plaintiffs acknowledge, a "SHW system is less

27  than 1/5 the cost of grid-tied PV system with an equivalent energy output."  (Ex. 2 at 16.)

28

39.     I know that the substantial cost of a new PV system requires many users to obtain financing for the system.  I believe that many of these government programs are limited to just PV or just SWH systems.  For example, I have been shown the California Solar Incentive Program Handbook, which states that "PV systems are the only technologies eligible to receive incentives from the SASH [Single-family Affordable Solar Homes] Program.  Non-PV technologies, including solar hot water systems, are not eligible for SASH Program incentives." (Ex. 333 at 27 n.8.)  Therefore, I believe it would be impossible for a customer to mistakenly purchase a PV system instead of a SWH system, or vice versa.

40.     In the Court's preliminary injunction order, the Court cited evidence that "[w]ithin California, both types of products are installed by the same contractor."  (Dkt. No. 63 at 21.) While it is technically accurate that the same contractor could install both systems, in practice this is rare.  In fact, I learned that the State of California has a separate training program for SWH contractors, which PV contractors are not required to complete.  Section 2.1.4.3 of the CSI-Thermal Program Handbook states: "Contractors are required to attend a designated CSI-Thermal Program training workshop.  Attendance is required by the CSLB license owner and is encouraged for other employees involved with the CSI-Thermal application process. Only contractors who participate in this workshop will be eligible to apply for incentives from the program."  (Ex. 332 at 15.)

41.     There could be an occasional residential contractor who has been trained and licensed to install a solar water heater in one customer's house and PV panels in another customer's house (or in very rare cases, install both in the same house, although the products would serve entirely different functions).  But I believe that those would form a small and sophisticated group.  Some commercial developers, who install the quite expensive installations described above, may have an occasional project that involves solar water heating.  I believe that these sophisticated purchasers would be quite aware of the market segmentation described above, and would be highly unlikely to believe a United States manufacturer in one market has a relationship with a Chinese manufacturer in another merely because of a similarity in name.

42.     I have read about the example of "solar cogeneration technology" offered by Richard Reed, the CEO of Plaintiff SunEarth Inc.  (Dkt. No. 141 at ¶ 11.)  That example, however, demonstrates just how unusual it would be for PV and SWH technologies to be combined into one product.  Reed admits that this technology has only developed "within the last few years." (Id.)  According to the September 2012 article about solar cogeneration that Reed discusses, the technology is "an entirely new path in cogenerating electricity and hot water using low concentrating PV (LCPV) for commercial rooftops."  (Ex. 210 at 1 (emphasis added).)  The other article cited by Reed in his Direct Examination, from May 2012, indicates that: "The installation will be the first healthcare solar cogeneration application…" (Ex. 211, at 2 (emphasis added).) According to these materials, solar cogeneration is something new under the sun.  I believe it remains to be seen whether combining PV and SWH technology in this way will ever gain a foothold to become something more than a curiosity.  In any event, we have never been in, nor have any desire to enter, that area of experimentation.

43.     We have always devoted our business exclusively to the sale of PV panels. By contrast, Plaintiff SunEarth does not sell PV panels; it sells solar water heaters.  We do not sell solar water heaters. The parties thus do not compete for the sale of goods in any way.  I thus believe there is thus no possibility that either party's activities, under whatever trademarks, would ever cost the other entity so much as a single sale. Nor is there any apparent reason why either party would make so much as a single additional sale because of the activities of the other.  I thus understand that the likelihood of confusion issue is in this case is not economic harm, but whether the degree of similarity between the two names might lead to a mistaken belief by customers or others that the parties have a relationship.

## **Lack of Actual Confusion**

44.     The only allegation of actual "confusion" that Plaintiffs have attempted to support, to my knowledge, relates not to the presence of our products in the marketplace, nor to our advertising in international publications directed to the PV industry, but rather to the simultaneous presence of both companies at a trade show.  Plaintiffs allege that someone attending a trade show who sees the name Sun-Earth on our booth may think that it is our booth.

1   But if the person actually reaches the booth, however, he will readily realize that since all the

2   company at the booth sells are PV panels imported from China, that company is an entirely

3   different company from SunEarth Inc.  But, in any event, anyone who actually comes to our

4   booth (or theirs) could not reasonably believe that the companies are related, particularly since

5   these shows are directed to industry insiders, not the public at large.

6       45.     We have used the Sun-Earth mark to promote SESP's goods and services in

7   advertising accessible within the United States for several years.  Before the Court issued its

8   preliminary injunction, SESP had displayed the Sun-Earth trademark on nbsolar.com since as

9   early as 2003. (Ex. 314.)  Further, when we acquired the Sun-Earth.com domain name in 2007,

10  we configured the domain to redirect Internet visitors from Sun-Earth.com to nbsolar.com, which

11  was SESP's main website until we changed our name in 2010.  Thereafter, I believe we displayed

12  the Sun-Earth trademark on the Sun-Earth.com domain until the Court's preliminary injunction

13  prohibited such use.  (Ex. 166.)

14      46.     Since 2005, we have placed ads using the Sun- Earth trademark in Photon

15  International, a magazine directed to the international PV market.  (Ex. 320.)  I understand rom

16  information on its website, that a fraction of the copies of that publication (perhaps 20%) are

17  distributed in the United States.

18      47.     I understand, however, that Plaintiffs have offered no evidence that either our use

19  of the trademark on websites accessible in the United States since 2003 or our advertising in

20  Photon International since 2005 has caused any confusion.  I further understand that Plaintiffs

21  have testified that they never heard of us or our internationally known Sun-Earth trademark until

22  their own trademark application was rejected in March 2010.

23      48.     I would attribute this ignorance to the separateness of the industries.  Similarly,

24  when we began marketing the Sun-Earth brand in the United States in 2006-07, we were

25  ourselves not aware of the existence of Plaintiff SunEarth Inc.  Our first knowledge of that

26  company came when I attended the Solar Power Conference in Long Beach, California, as a

27  representative of SESP in September 2007.

28

49.     At the 2007 trade show, SESP was a Megawatt Sponsor and had reserved an exhibitor's booth.  When SESP initially registered for the Long Beach trade show, it submitted to the show's organizers the Sun-Earth trademark as a logo.  The records show that it appeared on the Long Beach trade show website from about February 17 through at least April 28, 2007.  (Exs. 318-319.)

50.     At that time, however, we had been considering promoting the "NBSolar" mark in the United States.  At some point prior to the September 2007 trade show, we decided we would rather have the organizers use the NBSolar mark than the Sun-Earth mark in the organizers' materials.  We thus submitted to the trade show organizers the NBSolar version for the organizers to use at the trade show.  At that trade show, I noticed that another exhibitor – Plaintiff SunEarth, Inc. – also used a variation of "Sun Earth."  Because of this similarity, I approached Plaintiff's booth during the show, introduced myself, described our use of that mark, and exchanged business cards.  Because Plaintiff was (and remains) in a completely separate industry from SESP, however, I was not concerned that we both used "Sun Earth" in our respective  businesses.

51.     From that point until June, 2011, when we were surprised to learn that Plaintiffs had filed an action to cancel our trademark, we had not given any thought to that company.  As previously noted, that company was in a different industry, to which our trademark registration had not been directed.

### SESP's Intent in Returning to the Sun-Earth Mark in 2010

52.     In the preliminary injunction order, the Court focused on "Defendants' intent in switching from the use of the nbsolar mark to the use of the Sun-Earth mark, which their representative admits happened in 2010."  (Dkt. No. 63 at 27-28.)  The Court concluded that Defendants' "intent" supported a finding of likelihood of confusion because "Defendants had actual knowledge of Plaintiffs' existence and their use of the Sun Earth mark and name."  (Dkt. No. 63 at 28.)  The Court however, did not state that Defendants intended to cause confusion between SESP and Plaintiff SunEarth, Inc., or to profit from it.  Quite the opposite is the case.

53.     We have never had any desire to be identified with, mistaken as, or perceived as having any relationship with Plaintiff SunEarth Inc.  To the contrary, we strongly believe that any

1    such identification, mistake, or perception would do absolutely nothing to help our business,

2    either monetarily or reputation wise.  We have our own hard-earned reputation, achieved through

3    our worldwide activities since 2004 as a leading supplier of PV panels to major utilities, to

4    preserve.  We thus have had no motive to create, or to tolerate, any confusion between the entities.

5    **III.    REMEDIES**

6          54.    If the Court ultimately finds that our simultaneous appearance at trade shows in the

7    United States caused unacceptable confusion, then I understand that the Court could enjoin us in

8    that respect.  Or if the Court ultimately finds that our use of the Sun-Earth brand caused

9    unacceptable confusion, then likewise I understand that the Court could require that we use the

10   NBSolar (or some other) brand.  But if the Court does that, we would request that the Court not

11   enjoin certain activity as to which no evidence of confusion has been shown – namely,

12   inconspicuously identifying SESP as the manufacturer on Defendants' NBSolar-branded panels

13   and advertising in the international publication, PHOTON International.

**<u>Identification of the Manufacturer</u>**

15         55.    For the reasons described below, SESP believes that ordinary business customs

16   require that SESP be identified as the manufacturer on Defendants' panels.

17         56.    As explained above, "Sun Earth" forms a vital part of SESP's corporate name

18   around the world and thus SESP cannot change that name.  Although after the preliminary

19   injunction in February 2012, we switched to NBSolar in the United States as the brand for our

20   products (and no longer use the "Sun Earth" brand), we believe it is nearly impossible to

21   completely avoid using the SESP name in the United States.  At numerous points along a panel's

22   journey from SESP's factory in China to the end user in the United States, we are required to

23   disclose the panel manufacturer's name.  For example, invoices, insurance agreements, packing

24   lists, warranties, and other business contracts frequently require that SESP be identified.  In

25   addition, SESP, as the manufacturer of the PV panels distributed in the United States, must be

26   identified as the party responsible for defects with the product.  Generally, this is done with a

27   small, inconspicuous manufacturers' label on the back of the product.  (As noted, however, all of

28   these products are now branded in the United States only as "NBSolar" products.)

57.     Defendants also believe they need to use the SESP trade name in order to purchase from sellers in the United States equipment for manufacturing PV panels in China.  SESP purchases millions of dollars of equipment from sellers within the United States.  SESP's trade name needs to be used to complete these purchases.  For example, SESP's trade name is used on contracts, invoices, packing lists, bills of lading, and applications for letters of credit, which are used when SESP purchases equipment for export from United States sellers to SESP in China.

58.     Similarly, Defendants believe they need to be able to disclose to their customers, partners, vendors, and other actors in the United States that SESP manufactures the NBSolar-branded products.  At trade shows in the United States, for example, Defendants need to be able to explain the source of their products and the NBSolar-SESP affiliation.  As above, Defendants need to be able to explain to potential customers that the products being sold under the NBSolar brand are identical to the products sold in Europe under the Sun Earth brand.  The attendees at such trade shows to whom these disclosures will be made would not be confused as to the source of the goods as the disclosures themselves are directed to communicating that precise information.

59.     A manufacturer's label, albeit inconspicuous, has particular practical importance to customers.  For example, I understand that Plaintiff SunEarth Inc. has testified at its deposition that it is required to affix to its SWH products a label identical to Exhibit 26, which identifies SunEarth Inc. as the manufacturer.  (Reed Dep. at 166:10-11.)  The label enables Plaintiffs to track the product if there are quality problems.  (Id. at 166:6-9.)  The label must stay affixed to Plaintiffs' products so that one can determine if there is a warranty.  (Id. at 166:21-167:2.)  It is important to be able to determine warranty coverage because that affects a manufacturer's liability.  (Id. at 167:17-20.)  The label also provides evidence that Plaintiffs' products are certified by various organizations.  (Id. at 164:19-165:6.)  Such certifications must be present when the product is resold and installed.  (Id. at 164:15-18.)  According to Plaintiffs themselves, these certifications are required in 49 states and in the U.S. tax code in order to be eligible for incentives and tax credits.  (Id. at 165:15-20.)  Florida requires that this information be affixed to Plaintiffs' products in order to do business in that state.  (Id. at 165:21-25.)  Code officials who inspect installations pursuant to a building permit and other requirements need to see this label.

1   (Id. at 165:3-6.)  All flat plate collectors have these labels affixed to them.  (Id. at 167:1-2.)  All

2   of Plaintiffs' labels produced in this lawsuit identify SunEarth, Inc.  (Exs. 26-30.)

3        60.    We use our product labels, in the PV industry, for a role similar to that described

4   by Plaintiffs in the SWH industry.  For example, we understand that, as a condition of

5   participating in solar incentive programs in the United States, many governments and utility

6   companies require that solar energy equipment be covered by a manufacturer's warranty.  The

7   California Solar Initiative Program Handbook states: "California Public Utility Code 387.5(d)(4)

8   requires that all solar energy systems that receive an incentive must have a warranty of not less

9   than 10 years to protect against defects and undue degradation of electrical generation output."

10  (Ex. 333 at 35; see also Ex. 203 at 4.)  The Handbook also states: "System Owners will

11  acknowledge on the Incentive Claim Form that they have received a 10-year warranty for no-cost

12  repair and replacement of the solar energy system."  SESP complies with these requirements by

13  offering to consumers a 10-year warranty covering defects in material or workmanship and a 25-

14  year warranty covering panel performance.  Exhibit 49 provides an example of the warranty we

15  offered in 2011, although the Sun-Earth mark has now been replaced with a NBSolar mark.  As

16  we believe is required under California law, this warranty is distributed to purchasers of panels

17  manufactured by SESP, to enable consumers to identify and contact SESP should they encounter

18  problems.  (Ex. 203 at 4.)

19       61.    We believe the warranty, however, is only useful if consumers are able to contact

20  SESP.  We are concerned that, should consumers misplace the warranty paperwork – which is

21  common over such a long period – in the absence of a manufacturer's name imprinted on the

22  panel itself, the consumers would generally be unable to identify SESP as the manufacturer to be

23  contacted about defective products.  As Plaintiffs have noted, a label which identifies the

24  manufacturer ensures that one is able to determine whether warranty coverage exists and, in turn,

25  who bears liability for problems.

26       62.    In addition to providing protection to consumers, the identification of SESP as the

27  manufacturer on the panels themselves has allowed SESP to discover and cure defects.  Like

28  Plaintiffs, SESP has for many years relied upon purchasers' feedback to quickly identify

1    problems in our manufacturing process.  We are concerned that removing SESP's name from the

2    panel would interrupt this feedback, frustrating both purchasers and SESP's quality control

3    procedures.

4        63.     We understand that financial incentives in the form of tax credits or rebates from

5    governments and utilities are widely available in the United States.  Without these incentives the

6    cost of PV panels is often prohibitive.  We understand that incentive programs typically have

7    equipment eligibility criteria to ensure the safety and efficiency of PV panels.  In California,

8    equipment included on the California Energy Commission (CEC) list is eligible for financial

9    incentives.  (Ex. 333 at 107; Ex. 203 at 4.)  SESP's equipment is included in the CEC list, with

10   SESP identified as the manufacturer.  (Ex. 84.)  SESP's customers worry that they will not

11   receive these financial incentives if SESP is not identified on the product itself.  (Ex. 203 at 4.)

12   Plaintiffs have admitted that obtaining incentives and tax credits requires certification from

13   various authorities, and a label is helpful – and, in some states, required – to demonstrate

14   eligibility for such incentives.

15       64.     Currently, SESP is identified on CEC's list as a manufacturer of PV panels.  (Ex.

16   84.)  I understand that the CEC requires inspectors to verify that the manufacturer of the installed

17   equipment matches the information that the purchaser previously submitted to assure that the

18   equipment qualifies for solar incentives.  The inspector can do this by checking on the name

19   printed on the manufacturer's label.  Section 4.9.1.1 of the CSI Handbook describes this

20   requirement: "The inspectors will verify the System is installed in accordance with information

21   provided on the Incentive Claim documentation, and in compliance with CSI handbook rules.

22   The following are some examples of what will be inspected and verified:

23       Modules and Inverter(s)

24       • Manufacturer

25       • Model Number (if model nameplate is not visible, invoice is necessary for verification)

26       • Quantity

27   (Ex. 333 at 83.)

28

65.     I understand that Section 4.9.2.2 of the CSI Handbook explains that an inspector can issue a failure for "[i]nstallation of PV modules, inverters and/or performance meters not on the CEC's list of eligible equipment or otherwise ineligible for incentives."  (Ex. 333 at 84.)  We are concerned that an inspector unable to verify the identity of a PV panel's manufacturer could issue a "failure."  We understand that failures can result in removal from the CEC's incentive program of applicants, solar contractors, system owners, or sellers.  We are concerned that the occurrence of such failures would ruin Defendants' reputation among applicants and contractors, which, in turn, would jeopardize Defendants' ability to do business in the United States.  SESP includes SESP's name on the nameplate to help inspectors to verify that its equipment is on the CEC's list, which should reduce the risk that failures will be issued.

66.     Defendants' customers in the United States have expressed concern to us when they learned in February 2012 that they might be precluded from identifying SESP as the manufacturer of panels in the United States.  (Ex. 203, at 4.)  Having submitted applications for incentives which identified SESP as the manufacturer, several of our customers warned that their federal incentives would be jeopardized if the panels they received were not identified as being manufactured by SESP.

67.     The United States Customs and Border Patrol ("CBP") charges different tariffs to different PV panel manufacturers.  We understand that to avoid being incorrectly charged higher tariffs, the CBP needs to be able to conveniently verify that SESP is the manufacturer of the panels we import into the United States.  We are concerned that prohibiting Defendants from identifying on the panel itself the fact that SESP is the manufacturer would increase the likelihood that the CBP would incorrectly impose a higher tariff.  We are concerned that this, too, could jeopardize our ability to do business under the NBSolar brand in the United States.

68.     If the Court were to issue a permanent injunction that did not allow Defendants to identify SESP as the manufacturer of NBSolar-branded products, no matter how inconspicuously, because of business and legal constraints Defendants would be unable, as a practical matter, to import and sell their NBSolar-branded products in the United States.

69.     Nor would it be sufficient to use the abbreviation "SESP" in lieu of Defendant's full name.  Without an accompanying explanation that "SESP" is an abbreviation for "Sun Earth Solar Power Co., Ltd.," people will not know that SESP refers to our company.  When performing a field inspection of a PV system (as described in Section 4.9.1.1 of the CSI Handbook (Ex. 333 at 82-83), an inspector would have no practical way to verify that our panels are on the CEC list because the list does not include the SESP abbreviation, only the full name. (Ex. 84.)  A PV system must be on the CEC list in order to be eligible for California's various financial incentives.  As explained in Paragraph 65, this could result in the issuance of a "failure," which could eventually result in applicants, solar contractors, system owners, or sellers being removed from California's incentive program.  (Ex. 333 at 86.)  As Plaintiffs themselves acknowledge, inspectors need to be able to see the information on such labels.  (Reed Dep. Tr. at 165:3-6.)  In an event, we are deeply concerned that SESP's customers, who, because of their sophistication believe it is important that SESP's full name appear on the label, would likely refuse to purchase SESP's panels out of concern that financial incentives would be unavailable. (Ex. 203 at 4.)

**Private Labeling Is Not a Feasible Alternative for SESP**

70.     Richard Reed, the CEO of Plaintiff SunEarth Inc., suggested that SESP's products could be marketed under NBSolar's name in the United States.  (Dkt. No. 141, ¶ 23.)  Based on Plaintiff SunEarth Inc.'s experience with one component (tanks) from one manufacturer (Rheem), Reed speculates that a private label arrangement "would not be complicated."  SESP's circumstances, however, are far different.  For several reasons, it is not feasible for SESP to use a private label arrangement to distribute its products in the United States.

71.     Under a typical private label arrangement that we have encountered in our industry, the manufacturer makes products for a third party, which then sells the products under the third-party's own brand, holds itself out to the world as the products' source, and takes responsibility for warranties and servicing associated with the products.  At my deposition, I had testified that SESP had a customer for which SESP had used the customer's private label.  Those products, however, were not part of SESP's standard line of products, were not covered by SESP's various

1  certifications (e.g., UL, CEC, etc.), and were not guaranteed by SESP.  In addition, the private

2  labeler provided its own specifications for product design, materials, technology, and packaging.

3       72.     In our experience, private labeling, where it occurs, has been initiated by the

4  customer itself and for its own business reasons.  SESP has very few customers that practice

5  private labeling.  By far the majority of SESP's customers insist that the actual manufacturer be

6  identified on the product, because they want to be able to show that the product was made by a

7  reputable producer.

8       73.     Even if we could persuade our customers to enter a private label arrangement, it

9  would not be feasible to provide a different certification label for each customer.  Since it began

10 selling PV panels in the United States in 2007, SESP has sold to the following 29 customers: (1)

11 ACA Technology Inc.; (2) Alpha Energy; (3) ATL Technology; (4) Boxermartin, Inc.; (5)

12 Calmonte Corporation; (6) CEIA-USA; (7) Centromax Group Inc.; (8) Clark Associates, Inc.; (9)

13 Cosmos Solar Energy Inc.; (10) Digital World Inc.; (11) Eco Innovations; (12) Everbright Solar,

14 Inc.; (13) International Development Corp.; (14) Lite Solar Corp.; (15) Lumen & Crystal; (16)

15 National Hardwood Flooring & Moulding; (17) Nbsolar USA Inc.; (18) Nicor Light Solar; (19)

16 Power Save Energy; (20) Ramsond (TN Trading Co. LLC); (21) Silicon Solar Ltd.; (22) Solar

17 Bridge; (23) Solarvision International; (24) Sun Sport Solar; (25) Sunnybrother DBA; (26) Surya

18 Energy Solutions, LLC; (27) Total Environmental Associates Inc.; (28) Waxman Industries, Inc.;

19 and (29) Wego Solar.  (Ex. 92.)

20      74.     Obtaining UL and CEC certification for each of its customers, as required under a

21 private label arrangement, would be prohibitively expensive.  Each series of product must have a

22 separate certification.  Currently, SESP has about 20 series of products on the CEC list, which

23 includes 80 types of products.  (Ex. 84, at 3-5.)  Adding these products to the CEC list in 2011,

24 after changing its name from Ningbo Solar Electric Power, cost SESP about 1.3 million RMB

25 (about $200,000).  (Ex. 92 at 10, § 4.2.)  Repeating this process for each customer would be

26 extraordinarily expensive.  It would also make it quite difficult for SESP to modify its existing

27 products or add new products because the re-certification would need to occur across all of its

28 customers.

75.     We believe that a private label arrangement would also impede the role that a manufacturer's label plays in ensuring quality control.  (Reed Dep. Tr. at 166:1-12.)  Private labeling would insert SESP's many customers in between the end user and SESP.  Technical problems reported to the private label customer would then need to be reported back to SESP, creating frustrating inefficiencies and the potential for miscommunication among customers, distributors, and SESP.

76.     Nor can SESP use NBSolar USA as the "manufacturer" on a private label.  It is possible that NBSolar USA may be shut down as a result of the difficult economic environment for PV products, and also because of the expense of this litigation.  All of its employees have been laid off.  It is unclear whether the company will exist in another year.  As Plaintiffs acknowledge, the company named on the manufacturer's label is the company that stands behind the product.  (Reed Dep. Tr. at 166:10-12 and 167:15-20.)  SESP believes it cannot in good faith identify NBSolar USA as the company that stands behind the warranty to Defendants' PV panels given the uncertainty about NBSolar USA's future.  (Ex. 333 at 35 (CSI Handbook, § 2.4 Warranty Requirements).)  Reed's example regarding Apple Computer is illuminating, in this respect.  (Dkt. No. 141, ¶ 7.)  When an iPad has a defect, it is Apple – a company with sufficient resources to stand behind its product – that is expected to and actually does provide assistance.  Likewise, it is SESP, not NBSolar, that has the resources to stand behind warranties and handle defective products.

77.     Reed states that he "looked into this process to evaluate how to go about selling photovoltaic systems made by other companies but sold by Solaray or SunEarth as Sun-Earth branded products."  (Dkt. No. 141, ¶ 23.)  His example, however, involves many manufacturers selling under one private label distributor.  By contrast, SESP's scenario would involve a single manufacturer selling products through numerous distributors.  Plaintiffs' circumstances are simply not comparable.

### SESP's Label Is Not Likely to Cause Confusion

78.     It is important to note that the name on the label has little, if anything, to do with the sales/marketing of the product because, in general, our customers would not see the

1    manufacturer's label until after the product has been purchased and delivered.  (Even then, the

2    customer would not likely examine the label, except for one of the purposes described below.)

3    As discussed above, the label serves an after-sale function.

4         79.    Notably, despite our selling over $8 million of panels bearing the Sun-Earth mark

5    in 2011, Plaintiffs have failed to identify a single instance of actual confusion relating to SESP's

6    use of the Sun-Earth mark on its products.

7         80.    In any event, to narrow the issues, SESP changed its label, as of August, 2012, to

8    the label below, inconspicuously printing SESP's full name along with SESP's Chinese address

9    on the label (as depicted below).  This is even less likely to cause confusion than the use of just

10   the Sun-Earth mark on Defendants' products.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27



28

81.     In its preliminary injunction order, the Court concluded that "[w]hile Defendants' mark is somewhat different in appearance, the sound meaning and appearance of the text are identical." (Dkt. No. 63 at 22.)  The use of SESP's full name ("Sun Earth Solar Power Co., Ltd.," in small font, directly above SESP's Chinese address, however, is a different matter.  Such a limited use of the words "Sun Earth" in that context, is not likely to cause confusion as to source or affiliation.

**PHOTON International**

82.     Europe, especially Germany, is the principal market for our photovoltaic panels.  It is important to our business (97% of which is outside the United States) that we advertise in European publications directed to the photovoltaics industry, and especially PHOTON International.  We are aware of no evidence that our advertising in this particular international publication has caused (or would cause) any such confusion, so we would request that it be carved out of any order.

83.     PHOTON International is not a United States publication.  It is published in Germany and directed to the international photoelectric market, only a small portion of which is in the United States.  The publisher, the Photon Group, does, however, issue a companion publication, called "PHOTON – The Photovoltaic Magazine," for the United States market.  Because of this litigation, we have refrained from placing any advertising in that United States market publication.

84.     SESP has a long-standing relationship with PHOTON International, having advertised its use of the SUN-EARTH brand in that publication since at least 2005, Plaintiffs have reported absolutely no confusion.  Our advertising has been placed by our European offices and directed to the European market.  In particular, we have partnered with companies in the European market and have used ads in PHOTON International to promote those relationships. As discussed above, because of SESP's presence in the European market, it is important to SESP to be able to continue that relationship with PHOTON International.

85.     I understand that the President of SunEarth, Inc. testified that his company has no sales whatsoever in Europe, where PHOTON International is published and the primary market to

1   which that publication is directed.  I also understand from his testimony that, apart from Canada

2   and Mexico, that company has very little international sales at all.

3          86.     Further, I understand that the PHOTON International website clearly states that the

4   publication is directed toward the "photovoltaics (PV) or concentrating solar power (CSP)"

5   industries, industries in which I understand SunEarth, Inc. does not currently participate, even in

6   the United States.  Rather, that company has testified it has concentrated its business, as I

7   understand it, almost exclusively in the SWH industry, which the PHOTON International website

8   does not even mention.

9          87.     According to information we have received from the Photon Group, PHOTON

10   International has a print run of approximately 28,000 copies per month for its English edition.  I

11   understand that Plaintiffs represent that a little more than 1,000 of those copies are sent to

12   subscribers in the United States.  Plaintiffs also contend that this magazine is distributed at trade

13   shows.  But another exhibit attached to their earlier motion papers (Dkt. No. 90-15, Ex. 7 to

14   Plaintiff's Proffitt Declaration) lists about 100 shows at which the publication is distributed, only

15   seven of which are in the United States.

16          88.     By contrast, "PHOTON – The Photovoltaic Magazine," which is aimed at the

17   United States market, has a larger print run, approximately 40,000 copies per month, most of

18   which I assume would be distributed in the United States.  As noted above, we do not place any

19   advertising in that United States market publication.

20          89.     We ask, therefore, that we be permitted to continue to place ads in PHOTON

21   International, as we have done since 2004.  If the Court feels it necessary, we would include in

22   the text of the ad a disclaimer, similar to ones the Court has already ordered, that any products

23   sold in the United States are branded NBSolar.

24   **IV.     SESP'S LACK OF PROFITS ON U.S. SALES IN 2011**

25          90.     In 2011, SESP made sales in the United States of 54,071,583 renminbi (RMB).

26   (Ex. 92 at 9, Sec. 1.12, "sales volume".)

27          91.     It cost SESP 52,655,455 RMB to manufacture these panels.  (Id. at 9, Sec. 2,

28   "sales volume".)

92.     In addition to the manufacturing costs, SESP incurred 4,478,904 RMB in expenses that actually contributed to sales of the accused products in 2011.  (Id. at 10, Sec. 4, "Sub Total".) These expenses consisted of seven categories.

93.     First, SESP spent 81,765 RMB to obtain UL certification for SESP's panels sold in the United States in 2011.  (Id. at 10, Sec. 4.1.)

94.     Second, SESP spent 1,279,400 RMB to have SESP's panels listed on the California Energy Commission's list of devices eligible for financial incentives.  (Id. at 10, Sec. 4.2.)

95.     Third, SESP spent 492,245 RMB on air travel and other expenses associated with attending various business conferences and meetings in the United States in 2011.  (Id. at 10, Sec. 4.3.)

96.     Fourth, SESP spent 206,232 RMB on salaries and bonuses for its employees working to sell products in the United States in 2011.  (Id. at 10, Sec. 4.4.)

97.     Fifth, SESP spent 48,115 RMB on business travel expenses in the United States in 2011, in addition to the expenses noted above.  (Id. at 10, Sec. 4.5.)

98.     Sixth, SESP spent 1,176,851 RMB on costs related to interest payments on SESP's loans in 2011 are allocable to SESP's sales of panels in the United States.  (Id. at 10, Sec. 4.6.)

99.     Seventh, SESP spent 1,194,296 RMB on freight and insurance fees for panels sold in the United States in 2011.  (Id. at 10, Sec. 4.7.)

100.    SESP's lack of profits is consistent with a June 2011 Bloomberg article provided by Plaintiffs, which noted that "[m]anfuacturers of solar cells, the device fastened to panels for converting sunlight into electricity, have cut their price about 21 percent this year, prompting panel makers to follow suit…"  (Ex. 338 at 3.)  Another 2011 article provided by Plaintiffs noted that "many China-based solar firms will likely suffer from this fast and furious slash of quotes."  (Ex. 339 at 2.)

**V.      CYBERSQUATTING**

101.    SESP purchased the sun-earth.com domain in August 2007.  (Ex. 186 at 4.)

102.     SESP designed the sun-earth.com website to redirect Internet visitors to nbsolar.com, SESP's main website from 2003 until 2010, where it prominently displayed the Sun-Earth trademark.  (Ex. 314.)  Thereafter, SESP used the sun-earth.com website to display the Sun-Earth trademark.  (Ex. 314.)  SESP has therefore always used the sun-earth.com domain to promote SESP's own business since acquiring the domain in 2007.  It has no intention of selling or transferring the domain, and has rejected Plaintiffs' offer to acquire the domain.  (Ex. 21, at 4-6.)

103.     In 2010, as it became clear that the Trademark Office would register SESP's Sun-Earth trademark, SESP registered additional websites incorporating that trademark.  In February 2010, having receiving no opposition to the publication of its Sun-Earth trademark in November 2009, SESP registered the sunearth.us domain.  (Ex. 192.)  On November 2, 2010, SESP received notice that the Trademark Office had accepted SESP's Statement of Use regarding its Sun-Earth trademark registration.  (Ex. 66 at 6.)  Later that month, SESP registered the following domains incorporating its Sun-Earth trademark: sunearthpower.net; sunearthpower.com; sunearthsolarpower.net; sunearthsolarpower.com; sunearthsolar.net.  (Ex. 193.)

104.     SESP currently uses or has plans to use these additional domains to replicate the content on its sun-earth.com website (collectively, the "Sun Earth Domains").  As with the sun-earth.com domain, SESP used these websites to promote its own business and has no intention of selling the domains.

105.     SESP has registered the Sun-Earth trademark in numerous countries outside the United States.  (Exs. 302-308.)

106.     SESP's Sun Earth Domains include part of SESP's legal name, Sun Earth Solar Power Co., Ltd.

107.     SESP uses the Sun-Earth trademark to capitalize on the goodwill that SESP has established globally, particularly with utility companies in Europe.  As discussed in Paragraph 53, we have never had any desire to be identified with Plaintiff SunEarth Inc.  In any event, there is no risk of any confusion occurring in the United States because SESP has blocked United States visitors from accessing the Sun Earth Domains.

1    108.    SESP did not provide any false or misleading contact information when it

2    registered the Sun Earth Domains.  When registering the domains, SESP provided contact

3    information for SESP employee Cai Ye, myself, or "Ningbo Taiyangneng Dianyuan Youxian

4    Gongsi," the pinyin spelling of SESP's former name, Ningbo Solar Electric Power Co.  (Exs. 193,

5    310-312, 315.)

6    109.    For the reasons described in Paragraph 18, and because SESP had rights in the

7    Sun-Earth trademark when it registered the Sun Earth Domains in 2007 and 2010, we believed,

8    and continue to believe, the registrations were lawful.

9    **VI.    MISCELLANEOUS**

10    110.    As previously discussed, after we were surprised by Plaintiffs' cancellation

11    petition before the TTAB, we believed our use of the Sun-Earth mark in the United States in 2011

12    was not likely to cause confusion.  The Court, however, took a different view in its preliminary

13    injunction order on February 3, 2012.  We recognized we had an uphill battle to persuade the

14    Court to change its mind.  In light of the Court's order, we abandoned any plans to continue doing

15    business under the Sun-Earth brand in the United States.  We expected that our decision would

16    leave little to fight over and sought to bring the litigation to a conclusion at a mediation session

17    on March 23, 2012.

18    111.    Regrettably, Plaintiffs have been unwilling to accept the Court's Modified

19    Preliminary Injunction and so have insisted on dragging out for months this dispute, imposing

20    upon both parties unnecessary expense.

21    112.    Seeking to end this lawsuit, on April 2, 2012 we served an offer of judgment to

22    make permanent the terms of the Court's Modified Preliminary Injunction of March 17, 2012, to

23    consent to cancellation of SESP's Sun-Earth trademark registration, and to pay Plaintiffs a sum of

24    money.

25    113.    On July 12, 2012, while meeting with Plaintiffs and Magistrate Judge Cousins, we

26    again offered to make permanent the terms of the existing injunction.  Despite Defendants' best

27    efforts, however, no settlement was reached.

28

1    114.    As a result of the extraordinary expense of this lawsuit, combined with a difficult

2    market for photovoltaic products, Defendants have been forced to bring to a halt nearly all

3    business operations in the United States.

4

5    Dated:  October 8, 2012                    By: /s/ Yuming Dong

6                                                   Yuming Dong