IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNEARTH, INC.; and THE SOLARAY CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> SUN EARTH SOLAR POWER CO., LTD.; NBSOLAR USA, INC.; and DOES 1-10, <br><br> Defendants. <br> _____/ | No. C 11-4991 CW <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER RESOLVING MOTION FOR PARTIAL SUMMARY ADJUDICATION, MOTION IN LIMINE, MOTION TO SEAL, MOTION TO STRIKE AND MOTION FOR JUDICIAL NOTICE (Docket Nos. 122, 133, 135, 143 and 152) |

Plaintiffs SunEarth, Inc. and The Solaray Corporation bring this trademark and trade name infringement action against Defendants Sun Earth Solar Power Company and NBSolar USA, Inc. For the bench trial in this matter, the Court instructed the parties to offer their direct testimony through the designation of declarations and deposition transcripts, including those submitted previously in this case. The parties have filed trial briefs with these declarations, deposition transcripts and documentary evidence and also include citations to the material that they submitted previously with the earlier motions.[1] The parties were given the opportunity to cross-examine witnesses during the bench

_____

[1] Defendants move to seal Exhibits 1 to 12 to the declaration of Eric J. Rutt submitted in opposition to Plaintiffs' motion in limine. Docket No. 135. Defendants represent that these exhibits contain various types of their financial information and sales figures. Having reviewed the documents in question, the Court finds that Defendants have established that these documents are sealable and GRANTS their motion to seal.

United States District Court
For the Northern District of California

trial.[2]  The parties also filed post-trial briefs and written closing arguments.

Each side objects to some of the evidence submitted by the opposing side.  The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually.  To the extent that the Court has relied on evidence to which one side has objected, such evidence has been found admissible and the objections are overruled.

The Court now enters its findings of fact and conclusions of law.

FINDINGS OF FACT

Plaintiff SunEarth, Inc. was created and incorporated in the state of California in 1978.  Decl. of Richard Reed in Supp. of Mot. for Prelim. Inj. (1st Reed Decl.), Docket No. 30, ¶ 2; Parties' Joint Statement of Undisputed Facts ¶ 2; see also Bench Trial Tr., Docket No. 150, 11:24-12:5 (testimony that the company was incorporated in 1978 and changed its name to SunEarth in 1985).  Plaintiff The Solaray Corporation acquired SunEarth, Inc. on July 1, 1992, and has independently operated SunEarth, Inc. as a subsidiary under the SunEarth name since that date.  1st Reed Decl. ¶¶ 4-6.  Under the SunEarth, Inc. name, Plaintiffs manufacture and sell solar thermal collectors and related components.  Id. at ¶¶ 55, 57.  Plaintiffs have used SunEarth as a house mark in selling the "SunEarth Empire" since 1987, the

_____

[2] Plaintiffs chose to cross-examine one of Defendants' witnesses, Yuming Dong, and Defendants chose to cross-examine one of Plaintiffs' witnesses, Richard Reed.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"SunEarth Copperheart" since 1992, the "SunEarth SunSiphon" since 1994, and the "SunEarth CompRail" since 2003. Reed 1st Decl. ¶ 8; see also Trial Ex. 9, Docket No. 30-7 (specification brochure for the SunEarth CopperHeart series dating to June 2002 showing use of SunEarth as a house mark). Plaintiffs registered and began using the domain name www.sunearthinc.com in 1990. Id. at ¶ 11.

Defendant Sun-Earth Solar Power Co., Ltd. (SESP), located in Ningbo, China, was known as Ningbo Solar Electric Power Co., Ltd. until 2010, when it changed its name to SESP. Direct Examination Declaration of Yuming Dong (Dong Direct Exam.), Docket No. 142, ¶ 6; Parties' Joint Statement of Undisputed Facts ¶¶ 6-7. It began manufacturing photovoltaic panels in 1978. Id. at ¶ 2. Starting in that year, it branded its photovoltaic panels with the Chinese words for "Sun Earth." Id. In January 2010, Defendant NBSolar USA, Inc. was formed as a California corporation affiliated with SESP. Id. at ¶ 12.

Solar thermal collectors are a type of solar energy technology, which collect the heat of the sun and transfer that heat to a liquid. 1st Reed Decl. ¶ 55; Dong Direct Exam. ¶ 29; Parties' Joint Statement of Undisputed Facts, Docket No. 126, ¶ 1. The most common use of solar thermal collectors is to heat water for home or light industrial use. 1st Reed Decl. ¶ 56. They can also be used to heat swimming pools or for space heating, and are sometimes used to boil water used for larger-scale power production. Id. Plaintiff SunEarth, Inc. sells solar thermal collectors, components for mounting collectors and complete solar heating systems for home or light industrial use. Id. at ¶ 57.

Another type of solar energy technology is photovoltaic, in which photovoltaic cells absorb light from the sun to create a voltage in the cell, which is used to produce an electric current. 1st Reed Decl. ¶ 58; Dong Direct Exam. ¶ 30; Parties' Joint Statement of Undisputed Facts ¶ 1.  Photovoltaics are more expensive than solar thermal collectors, but have a wider variety of uses.  1st Reed Decl. ¶ 58.  Unlike with solar thermal collectors, consumers can sell excess electricity that they obtain from photovoltaics to a utility company.  Dong Direct Exam. ¶ 30. Defendants manufacture photovoltaic products for large-scale utility companies, commercial rooftop applications and residential markets, and do not sell solar thermal collectors.  Id. at ¶¶ 27, 34.  Although globally Defendants' target business is the utility market, within the United States, most of their business comes from commercial customers.  Id. at ¶ 36.  Within the United States, they also sell systems to installation companies which install photovoltaic systems in residential locations.  Id. at ¶¶ 36-37.  Because photovoltaic systems are so expensive, residential users generally have to obtain financing for them and many of the financing programs are limited to one technology: either photovoltaics or solar thermal collectors.  Id. at ¶¶ 38-39.  Different manufacturing processes and technology are required to produce solar thermal collectors and photovoltaic systems.  Id. at ¶ 31.  Production of solar thermal collectors generally involves "the production and welding of copper pipes."  Id. at ¶ 31.  In contrast, the production of photovoltaic systems involves very different processes, using expensive equipment and specific technical knowledge, including the purification of silicon raw

4

materials and production of silicon wafers.  Id.  The United

States Energy Information Administration categorizes solar thermal

collectors and photovoltaic systems separately and issues separate

surveys to their manufacturers.  Id. at ¶ 32.  The products are

also assigned different identifying codes for customs and

importation.  Id.

Some solar technology consumers choose to use either a solar

thermal collector, a photovoltaic system or some combination of

the two.  1st Reed Decl. ¶ 61; see also Bench Trial Tr. 16:1-19

(testimony that customers have asked for both systems).  Some

consumers choose between using a solar thermal collector and a

photovoltaic system for heating water for their homes,

particularly because photovoltaics have declined in price in

recent years.  Bench Trial Tr. 14:25-15:15, 16:7-19.  Defendants

admit that, in some cases, residential customers do have both

types of products installed in their homes.  Dong Direct Exam.

¶ 41.  Some of Plaintiffs' advertisements contain a comparison of

the efficiency and cost of their solar thermal collectors to that

of photovoltaic systems.  1st Reed Decl. ¶¶ 59-60.  Within

California, one category of contractors' licenses encompasses

installation of both types of products.  See Cal. Code Regs. tit.

16, § 832.46 (defining, for licensing purposes, a "solar

contractor" as one who "installs, modifies, maintains, and repairs

thermal and photovoltaic solar energy systems").  Defendants also

admit that residential contractors and commercial developers may

occasionally be trained and licensed to install both solar thermal

collectors and photovoltaic systems.  Dong Direct Exam. ¶ 41.  See

also Depo. of Mark Frenette (Frenette Depo.), Docket No. 151-5,

United States District Court
For the Northern District of California

83:24-85:12 (testimony of former NBSolar employee stating that there are some, but not many, contractors who install both systems).  Plaintiffs have also submitted evidence from the USPTO online trademark database that there are at least fifty-one currently registered marks used to brand both solar panels used to generate heat, like Plaintiffs' solar collectors, and solar panels used to generate electricity, like Defendants' products.  Trial Ex. 174, Docket No. 47-2.

Although SunEarth, Inc. primarily sells solar thermal collectors, some of its products are complementary or competitive with photovoltaic systems and it has had some experience with such products in the past.  On a few occasions, it sold photovoltaic systems and components under the SunEarth, Inc. trade name, although not using the SunEarth trademark.  Direct Examination Declaration of Richard Reed (Reed Direct Exam.) ¶¶ 6-7.[3]  Plaintiffs advertise and maintain a demonstration installation directly contrasting their solar thermal collectors with a

_____

[3] Defendants move to strike portions of the direct examination declaration of Mr. Reed.  Docket No. 143.  They state that, in certain paragraphs of this declaration, he has offered expert testimony.  They argue that this should not be permitted because he was not disclosed as an expert witness by the deadline set previously by the Court and because Plaintiffs did not provide Defendants with any of the information required by Federal Rule of Civil Procedure 26(a)(2)(B) and (C).  Plaintiffs have not disputed that they failed to do so and, as previously indicated at the final pretrial conference, lay witnesses are not permitted to offer expert opinions.  However, the paragraphs that Defendants seek to strike do not consist entirely of expert opinions; instead, some of these paragraphs describe Mr. Reed's background and Plaintiffs' own experiences.  Accordingly, the Court GRANTS in part the motion to strike and DENIES it in part.  The Court strikes the following portions of the declaration:  page 3, lines 18-19 and 23-28; page 4, lines 1-13 and 16-25; page 5, lines 4-6 and 13-28; page 6, lines 1-10; page 7, lines 4-5, 11-13 and 19-27; page 8, lines 1-16, 19-28; and page 9, lines 1-19 and 23-26.

comparable solar photovoltaic system.  1st Reed Decl. ¶ 60.

Plaintiffs also have developed a hybrid product that combines both

technologies into a single unit.  Id. at ¶ 61.  They later helped

to start a company, originally called PVT Solar, which created a

hybrid photovoltaic thermal product that it now markets directly

to building contractors.  Bench Trial Tr. 16:20-17:12.  In June

2003, SunEarth, Inc. also began to sell rail mounting systems for

generic photovoltaic modules under the product name SunEarth

CompRail.  1st Reed Decl. ¶¶ 8, 89; see also Reed Direct Exam ¶ 6

(describing the rail mounting system, or strut, sold by SunEarth,

Inc. for mounting solar thermal collectors or photovoltaic

panels).  The company's SunEarth Solaray water heating system is

available with a photovoltaic-powered pump.  1st Reed Decl. ¶ 54;

Trial Ex. 123, Docket No. 30-25.

SunEarth, Inc. has enjoyed success and recognition in its

field.  In 2003, it received media attention after its solar

thermal collectors were installed on the White House.  1st Reed

Decl. ¶¶ 9, 72.  Plaintiffs have submitted testimony from the

company president, Richard Reed, stating that, under the trade

name SunEarth, they have sold more than $80 million worth of solar

thermal collectors and related products since 2000 in forty-nine

states, including California and Texas, about $14 million of which

was in California alone.  1st Reed Decl. ¶ 5; Decl. of Richard

Reed in Supp. of Pls.' Reply in Supp. of their Mot. for a Prelim.

Inj. (2nd Reed Decl.), Docket No. 46, ¶ 8.  About $6.8 million of

the sales in California took place between 2000 and 2007 (about $5

million between 2000 and 2006), and sales figures have been

increasing since 2000.  2nd Reed Decl. ¶ 9 (containing sales

figures by year). Plaintiffs have also provided a 2008 magazine article recognizing that they sold thirty-nine percent of all solar thermal collectors sold in the United States during 2007, a figure corroborated by Reed. Trial Ex. 145 (2nd Reed Decl. ¶ 10, Ex. 40, Docket No. 46-1). The company was profiled in the Winter 2010 issue of Energy Leaders Today. Trial Ex. 7 (1st Reed Decl. ¶ 78, Ex. 11, Docket Nos.30-11, 30-12). Plaintiffs' website receives over 3,400 visitors per month and they spend approximately $66,000 per year in advertising and marketing costs. 1st Reed Decl. ¶ 64.

In addition to operating SunEarth, Inc., Solaray also does business as "Inter-Island Solar Supply" and is one of the nation's largest distributors of renewable energy products, including solar thermal collectors and photovoltaic systems. Reed Direct Exam. ¶ 4. Prior to 2008, Solaray, through Inter-Island Solar Supply, which is based in Hawaii, was primarily focused on solar thermal products. Bench Trial Tr. 20:14-20. Since that time, Solaray has substantially increased its photovoltaic business. Id. at 14-25. Between October 2011 and September 2012, Solaray sold several tens of millions of dollars of photovoltaic panels manufactured and branded by other companies, such as SolarWorld, Kyocera Solar, Inc. and Hyundai. Reed Direct Exam. ¶ 4. The president of SunEarth, Inc. and Solaray testified that, based on the recent success that Solaray had in expanding into the photovoltaic area, the companies anticipate that SunEarth, Inc. will begin distribution of photovoltaic and related products in California within the next few years. He has considered doing this with a

private label of the name SunEarth.  Bench Trial Tr. 34:12-36:5;
Reed Direct Exam. ¶ 16.

    In 1996, Ningbo Solar (now SESP) registered in China a
trademark for the Chinese-language form of the following marks,
referred to herein as "Defendants' Sun-Earth mark":

 

Dong Direct Exam. ¶¶ 5, 15; Xie Depo., Docket No. 151-3, 69:6-
70:18; Parties' Joint Statement of Undisputed Facts ¶ 10.  The
Chinese characters translate "verbatim into English" as "the sun
and the earth."  Xie Depo., 70:3-5.  Beginning in 2004, Ningbo
applied for and received trademark registrations for its Sun Earth
mark in certain countries other than the United States.  Parties'
Joint Statement of Undisputed Facts ¶ 10.  Since 2005, Defendants
placed advertisements using the Sun Earth mark in a trade
magazine, Photon International, which is circulated in the United
States, among other places.  Dong Direct Exam. ¶ 46.  In addition,
in 2007, the company had an auxiliary mark,

referred to herein as "the nbsolar mark," which was a shortened
form of the company's then-name.  Dong Direct Exam. ¶ 9.  Although
the nbsolar mark was used to an extent outside of the United

9

States, prior to 2007, SESP primarily used Defendants' Sun-Earth
mark for sales of its goods internationally.  Id.  From 2004 on,
SESP's customers in Europe and China usually referred to the
company as "Sun Earth" or as "Ningbo Solar."  Bench Trial Tr.
46:9-18.

SESP presently sells photovoltaic systems only and is among
the largest photovoltaic manufacturers in the world.  Dong Direct
Exam. ¶ 43; Parties' Joint Statement of Undisputed Facts ¶ 9.
Plaintiffs' CompRail product can be used to mount Defendants'
photovoltaic modules.  1st Reed Decl. ¶ 8.  Defendants began
marketing their photovoltaic panels outside of China in 2004.
Dong Direct Exam. ¶¶ 2, 4.  Currently, the vast majority of
Defendants' business comes from international utility markets,
with about seventy percent of their business in Europe, about
fifteen percent in China and about three percent in the United
States.  Id. at ¶ 35.

On July 5, 2006, Ningbo Solar filed an "intent-to-use"
application with the United States Patent and Trademark Office
(USPTO) to trademark its Sun-Earth mark.  Parties' Joint Statement
of Undisputed Facts ¶ 11; Trial Ex. 64, Docket No. 122-7, 23.  It
did not perform a trademark search or spend any resources
conducting a trade name search for companies using that name
within the United States before doing so.  Parties' Joint
Statement of Undisputed Facts ¶ 12; Bench Trial Tr. 43:19-44:5.
The USPTO published the mark for opposition on July 10, 2007.
Parties' Joint Statement of Undisputed Facts ¶ 13.  On October 2,
2007, after it did not receive any opposition, the USPTO issued a
notice of allowance.  Id.; Trial Ex. 64, Docket No. 122-6, 56.  In

United States District Court
For the Northern District of California

the notice, the USPTO warned, "You filed the trademark application identified below based upon a bona fide intention to use the mark in commerce.  You must use the mark in commerce and file a Statement of Use . . . before the USPTO will register the mark." Id.  Ningbo Solar never responded to the notice of allowance and did not file a statement of use.  Parties' Joint Statement of Undisputed Facts ¶ 14.  Thus, on June 4, 2008, USPTO issued a notice that the application had been deemed to be abandoned.  Id.; Trial Ex. 64, Docket No. 122-6, 54.

Ningbo Solar began selling its photovoltaic systems and components within the United States in approximately April 2007. Id. at ¶ 10; Parties' Joint Statement of Undisputed Facts ¶ 21. It then decided because "at that time, the Sun-Earth mark was as yet little known in the United States, . . . it would be a good idea for us to promote the NBSolar trademark in that county." Dong Direct Exam. ¶ 10.  Based on that, it "phased out the use of the Sun-Earth trademark on goods shipped to the United States in favor of the NBSolar trademark."  Id. at ¶ 11.

In September 2007, Plaintiffs and Defendants attended a trade show in Long Beach, California.  This was Defendants' first marketing event to introduce their photovoltaic panels to customers in the United States, and they first become aware of Plaintiff SunEarth, Inc. at this trade show.  Bench Trial Tr. 47:9-14; Dong Direct Exam. ¶ 48.  Defendants' Sun-Earth mark appeared from February through April or May 2007 on the website for the show in the list of sponsors, until Defendants chose to ask the trade show organizers substitute the nbsolar mark for the Sun-Earth mark.  Dong Direct Exam. ¶¶ 49-50; Parties' Joint

11

Statement of Undisputed Facts ¶¶ 32, 34.[4]  Defendants did not know
of the existence of SunEarth, Inc. at the time that they switched
to using the nbsolar mark instead of the Sun-Earth mark.  Bench
Trial Tr. 50:18-22, 54:14-15.  Defendants were listed in the
official program distributed at the show as "Ningbo Solar Electric
Power" and their nbsolar mark appeared in the program.  Decl. of
Richard Reed in Supp. of Pls.' Suppl. Brief in Supp. of their Mot.
for a Prelim. Inj. (3rd Reed Decl.), Docket No. 54-1, ¶ 4 & Trial
Ex. 147, Docket Nos. 54-2, 54-3, 47.  Plaintiffs were listed as
"SunEarth, Inc."  Trial Ex. 147, 53.  A Ningbo representative
noticed that Plaintiffs' company name was the same as the name on

_____

    [4] In Defendants' supplemental brief in opposition to
Plaintiffs' motion for a preliminary injunction, they asserted
that Defendants' Sun Earth mark was "prominently placed on the
conference materials" and "displayed at the conference."  Defs.'
Suppl. Brief in Opp. to Mot. for Prelim. Inj., Docket No. 52, 1-2.
They argued that Plaintiffs "could scarcely have avoided noticing"
their use of this mark in the program materials and at the show
and that, because Plaintiffs had not promptly brought suit after
the conference, they had unjustifiably delayed in pursuing their
claims.  Id.

    After Defendants filed their supplemental brief, Plaintiffs
offered evidence that showed that, in archived copies of the
conference homepage, Defendants' Sun-Earth mark appeared on a
version from April 27, 2007, but was removed from later versions
and Defendants' nbsolar mark appeared instead.  Proffitt Decl. ¶¶
3-11, Exs. 47-51, Docket Nos. 54-7-54-12.

    Thereafter, Defendants sought leave to file additional papers
in response to Plaintiffs' evidence.  Docket No. 56.  In their
proposed response, they explained that their counsel had
"correctly assumed" that Defendants originally used the Sun Earth
mark in the conference materials but that their counsel did not
realize that Defendants later had the conference organizers
substitute the nbsolar mark in its place.  Proposed Brief, Docket
No. 56-2, 1.

United States District Court
For the Northern District of California

Ningbo's mark and visited Plaintiffs' booth, where he exchanged business cards with Plaintiffs.  Dong Direct Exam. ¶ 50.[5]

On December 12, 2008, Ningbo Solar filed a second application with the USPTO to trademark the Sun-Earth mark, alleging as its filing basis that it had a bona fide intention of using the mark in commerce.  Parties' Joint Statement of Undisputed Facts ¶ 15. This application was assigned Serial No. 77632347.  Id. Defendants did not conduct any search for use of the name Sun Earth within the United States.  Bench Trial Tr. 43:19-44:5.  They believed that "in the registration or application process, the authority would be conducting the search for that mark" and "if it was not acceptable, then we would have been told."  Id. at 55:1-20.  During the prosecution of this patent application, Defendants instructed their American trademark counsel to state that they had first used the Sun-Earth mark in the United States on July 2, 2010.  Depo. of Rosemary S. Tarlton (Tarlton Depo.), Docket No. 151-4, 114:11-115:7.  When no opposition to the application was filed, on February 16, 2010, the USPTO issued a notice of allowance for the Sun-Earth mark in International Class nine category of goods, encompassing "solar cells, solar panels, namely, photovoltaic panels and photovoltaic modules for the production of electricity; solar controllers, namely, photovoltaic controllers."  Parties' Joint Statement of Undisputed Facts ¶ 15.

---

[5] Mr. Dong also stated that he "described our use of" the Sun-Earth mark to Plaintiffs during this exchange.  Dong Direct Exam. ¶ 50.  The Court notes that Defendants have represented that, at the time, they used this mark only outside of the United States.  Thus, Mr. Dong's declaration does not support that a finding that Plaintiffs knew of Defendants' use of the Sun Earth mark in September 2007.

After Defendants filed a statement showing that the first use of the mark in commerce was July 2, 2010, the USPTO issued them a registration certificate for the mark and assigned it Trademark Registration No. 3,886,941.  Defendants believed that this registration would protect their right to use the mark and prevent any infringement actions such as this one.  Bench Trial Tr. 55:11-15.

On December 24, 2009, Plaintiffs filed an application with the USPTO seeking to trademark SUNEARTH in International Class eleven, to encompass "solar collectors, namely, solar water heaters and parts and fittings therefor."  Trial Ex. 113, Docket No. 30-9, 7-8, 10.  On March 23, 2010, Plaintiffs' trademark application was "suspended pending the disposition of . . . Application Serial No(s). 77632347."  Id. at 2.  At the time, Plaintiffs' president understood the suspension to be because "the office was analyzing another pending application with a similar name."  Deposition of Richard R. Reed (Reed Depo.), Docket No. 151-1, 126:2-12.  That was when he learned of Defendants.  Bench Trial Tr. 18:18-25.

In January 2010, Defendant NBSolar USA Inc. was formed as a California corporation.  Dong Direct Exam. ¶ 12.  SESP is NBSolar's parent corporation.  Id. at ¶ 1.

Defendants own seven domain names containing SunEarth at issue in this litigation, although their main website was nbsolar.com until 2010.  Id. at ¶ 102; Trial Exs. 192, 193, Docket No. 122-13.  They displayed Sun-Earth on the nbsolar.com website from approximately 2003.  Trial Ex. 314, Docket No. 124-18. Defendants purchased the domain name sun-earth.com in August 2007.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Dong Direct Exam. ¶ 101; Trial Ex. 81, Docket No. 122-8.[6]  Once

2  they had ownership of the sun-earth.com domain name, they

3  "designed the sun-earth.com website to redirect Internet visitors

4  to nbsolar.com."  Dong Direct Exam. ¶ 102.  In 2010, in

5  anticipation of receiving a trademark for the Sun-Earth mark from

6  the USPTO, Defendants registered the domain names

7  sunearthpower.com, sunearthpower.net, sunearthsolarpower.com,

8  sunearthsolarpower.net, sunearthsolar.net and sunearth.us.  Id. at

9  103; Trial Exs. 192, 193.  The .us domain name is reserved for

10 persons or companies that are residents of the United States or

11 foreign entities that do business in the United States.  Trial Ex.

12 192.

13      Sometime before January 1, 2010, Ningbo Solar had

14 discontinued the use of the Sun-Earth mark on its products sold in

15 the United States and sold only products branded with the nbsolar

16 mark within the country through all of 2010.  Parties' Joint

17 Statement of Undisputed Facts ¶ 22.  Defendants used the nbsolar

18 mark within the United States through the end of 2010.  Id.  At

19

20 _____

21      [6] In a February 24, 2012 declaration filed support of
   Defendants' motion to modify the preliminary injunction, Mr. Dong
22 represented that Defendants registered this domain name in 2004.
   1st Dong Decl., Docket No. 69-3, ¶ 4; see also Xie Decl., Docket
23 No. 43-1, ¶ 15 (attesting to the same information).  In his August
   23, 2012 declaration in support of Defendants' opposition to
24 Plaintiffs' motion for summary judgment, Mr. Dong stated that the
   earlier declaration was incorrect and that Defendants in fact had
25 purchased the domain name in 2007.  2nd Dong Decl., Docket No.
   124-1, ¶ 65.  He explained, "My attorney drafted this declaration
26 based on information that was available" publicly on a website
   called whois.com database, and that he had "assumed that it was
27 correct."  Id.; see also Rutt Decl., Docket No. 124-4, ¶¶ 2-7.  He
   represents that he has since discovered emails indicating that
28 Defendants purchased the domain names in August 2007, not when a
   third party had first registered it in 2004.  2nd Dong Decl. ¶ 65.

around that time, Defendants decided that they should begin using a product name that was unified throughout the worldwide market and that was the same as their company name, in order to capitalize on their international reputation.  Bench Trial Tr. 53:6-17.  The nbsolar mark was not as successful in the United States as Defendants had expected, and they believed that the Sun Earth name and mark had grown in prominence "nicely" between 2004 and 2010 in the markets where they used it.  Id. at 53:6-24.

On November 19, 2010, Ningbo Solar changed its name to SESP in China.  Parties' Joint Statement of Undisputed Facts ¶ 7.  At that time, SESP "took defensive steps to protect our SUN-EARTH mark from dilution in China."  Dong Suppl. Decl., Docket No. 158-1, ¶ 4.  Its attorneys filed twelve trademark registration applications in China, in a number of different international categories.  Id.  Included within this was an application for a trademark registration in International Class eleven; Defendants specifically sought to cover "solar water heaters," among other

1   products.  Id. at ¶¶ 4-5.[7]  Defendants represent that, although

2   they sought to prevent the dilution of the Sun Earth mark by

3   obtaining this trademark, they did not intend to make solar water

4   heaters.  Id. at ¶¶ 2, 4.

5       On April 28, 2011, SESP filed documentation with the USPTO

6   showing that Ningbo Solar's name had been changed to SESP and that

7   _____

8       [7] Plaintiffs have asked that the Court take judicial notice
    of the Chinese trademark records which show that Defendants
9   applied for and shortly thereafter received a trademark in
    International Class 11 specifically covering solar water heaters.
10  Docket No. 152.  Defendants argue that Plaintiffs should not be
    permitted "to reopen the trial record" and they oppose this
11  request on the basis that Plaintiffs have not shown good cause for
    not including these records in their exhibit list.  Docket No.
12  158, 1-2.  Defendants do not dispute that the trademark
    registration documents are authentic and instead ask that, if the
13  Court considers these documents, it also consider a supplemental
    declaration from Mr. Dong that explains these registrations.  Id.
14  Plaintiffs reply that, if necessary, they did have good cause for
    failing to include the records in their case-in-chief because
15  Defendants had not disclosed them or their existence in discovery,
    despite a request for "[d]ocuments sufficient to identify all
16  trademarks owned by Defendants."  Mosier Decl., Docket No. 161-1,
    ¶¶ 3-8 & Ex. 1.
17
        The Court GRANTS Plaintiffs' request for judicial notice of
18  the trademark records and also GRANTS Defendants' request that Mr.
    Dong's supplemental declaration and the attached documents be
19  considered in conjunction with these records.

20      Plaintiffs have also asked that the Court take judicial
    notice of documents, including a fact sheet released October 10,
21  2012, by the International Trade Administration of the United
    States Department of Commerce finding that the Chinese central
22  government subsidized the products of photovoltaic cell
    manufacturers, including SESP, that were imported into the United
23  States between April 1, 2001 and September 30, 2011.  Plaintiffs
    argue that these "governmental subsidies constitute de facto
24  'revenues' which ought in equity be taken into account in
    determining any award of Defendants' profits under a theory of
25  unjust enrichment to Defendants due to Defendants' willful
    infringement."  Request for Judicial Notice, Docket No. 152, 3.
26  The Court DENIES AS MOOT their request to take judicial notice of
    these documents because the Court concludes that Plaintiffs have
27  not shown an entitlement to an award of Defendants' profits and
    thus these documents are irrelevant to the determination of
28  remedies.

an assignment of the registration of the Sun-Earth mark had been made to that company.  Parties' Joint Statement of Undisputed Facts ¶ 16.  Starting in January 2011, Defendants began using the Sun-Earth mark again in the United States and selling Sun-Earth branded products there.  Id. at ¶ 23.  Defendants' combined sales of these products in 2011 totaled $8.3 million.  Id. at ¶ 24.

Mark Frenette, a former employee of NBSolar, testified credibly at his deposition in this matter that "on some occasions" he had to explain to customers that the NBSolar panels were not made by Plaintiffs.  Deposition of Mark Frenette (Frenette Depo.), Docket No. 151-5, 129:11-20.[8]  Mr. Frenette was hired in late 2009 by ACA Technologies, Inc., which was a distributor for SESP in the United States.  Id. at 45:17-46:24, 67:20-68:21; 71:2-13; 156:3-13, 164:6-8. He began to receive his pay checks from NBSolar six months or less after starting, after NBSolar was incorporated. Id. at 46:23-47:7.  He worked at NBSolar until July 2011.  Id. at 98:6-24.  During his time at ACA and NBSolar, Mr. Frenette did marketing and sales of NBSolar products within the United States. He was familiar with Plaintiffs' products from his prior work and knew them as "the leading manufacturer of thermal" solar water hearing systems.  116:17-118:15.  Sometimes, when he called customers to market NBSolar's photovoltaic systems and he identified himself as being with "Sun Earth," customers would

_____

[8] In the joint pretrial statement, Defendants represented that they "will move for an order commanding the appearance as a witness at trial of Mark Frenette, who resides in the state of California but more than 100 miles from the Court."  Joint Pretrial Statement, Docket No. 126, 11.  Defendants did not so move.

assume that he was trying to sell products for the United States company that sold solar water heaters and tell him that they were not interested.  <u>Id.</u> at 129:11-131:4.  He would then have to overcome their initial rejection to explain the difference between the companies.  <u>Id.</u>

On January 18, 2011, an organizer for a solar power trade show in Colorado sent Plaintiffs' sales manager an email asking which logo he wanted to use for SunEarth, Inc. in the conference program, Plaintiffs' logo or Defendants' Sun-Earth mark. Declaration of Peter Bliss (Bliss Decl.), Docket No. 27, ¶ 4.  On July 6, 2011, a trade show organizer asked Plaintiffs' sales manager, "which SunEarth are you?"  <u>Id.</u> at ¶ 5.

Defendants registered for the Intersolar North America Conference held in San Francisco, California in July 2011 using both the Sun-Earth and nbsolar marks.  Parties' Joint Statement of Undisputed Facts ¶ 35; 1st Reed Decl. ¶ 16.  At Defendants' booth, the Sun-Earth mark was prominently displayed in a number of places in large print.  Trial Ex. 102, Docket No. 30-23.  At this conference, at least seven actual or potential customers "indicated confusion . . . in words or substance" to Plaintiffs' company president, Richard Reed, regarding whether Plaintiffs were affiliated with Defendants' company.  1st Reed Decl. ¶ 66. Several current or potential customers also expressed similar sentiments to Plaintiffs' sales manager, with one stating, "I thought you guys had changed your logo."  Bliss Decl. ¶ 6.

Defendants registered for the Solar Power International conference in Dallas, Texas in October 2011 under both the Sun-Earth and nbsolar marks.  Parties' Joint Statement of Undisputed

19

1  Facts ¶ 35.  At the Dallas conference, the Sun-Earth symbol was

2  displayed prominently at Defendants' booth.  Trial Ex. 103, Docket

3  No. 30-29.

4      Kelli Ross, the sales manager at Quick Mount PV, which

5  manufactures waterproof rooftop mounting systems for solar systems

6  that are distributed by Plaintiffs, attended this conference and

7  saw Defendants' Sun-Earth logo on a display booth.  Declaration of

8  Kelli Ross (Ross Decl.), Docket No. 122-12, ¶¶ 1-4.  She believed

9  that the logo was associated in some way with Plaintiffs and, when

10 she later spoke with Mr. Reed at another location of the trade

11 show, she mentioned "that I was somewhat surprised to see them at

12 that location because I had seen another 'Sun Earth booth' at a

13 different location on the trade show floor."  Id. at ¶¶ 5-6.

14     Les Nelson, President of Western Renewables Group, also

15 attended the Dallas conference.  Declaration of Les Nelson (Nelson

16 Decl.), Docket No. 122-11, ¶¶ 1-3.  He noticed Defendants' Sun-

17 Earth logo displayed prominently on a display booth and thought

18 that it "should somehow be affiliated" with Plaintiffs and "was

19 confused as to why a company" not related to Plaintiffs "would

20 label their company and their products with a name that I thought

21 would clearly indicate such an association."  Id. at ¶¶ 5-6.  Mr.

22 Nelson does not explain what Western Renewables Group is and does

23 not represent that he is a customer, potential customer or seller

24 of any parties' products.

25     On April 1, 2011, Plaintiffs filed a Petition with the

26 USPTO's Trademark Trial and Appeal Board (TTAB), seeking

27 cancellation of the registration of Defendants' Sun-Earth

28 trademark.  Parties' Joint Statement of Undisputed Facts ¶ 28;

United States District Court
For the Northern District of California

Sunearth, Inc. v. Sun Earth Solar Power Co., Ltd., Proceeding No. 92053829 (T.T.A.B.), Docket No. 1.  Pursuant to the rules governing the TTAB, the cancellation proceeding was suspended upon the filing of the instant litigation.  Parties' Joint Statement of Undisputed Facts ¶ 31.

On June 13, 2011, Plaintiffs sent Defendants a demand letter asking them immediately to cease using the Sun-Earth mark in their business operations within the United States.  Id. at ¶ 29.  The parties subsequently entered into a litigation standstill agreement in effect from June 13, 2011 through October 10, 2011.  Id. at ¶ 30.  In their case management statement, submitted to this Court on January 26, 2012, the parties "agree[d] that the time period of the standstill agreement, from June 13, 2011 to October 10, 2011 should not count towards any period of delay."  Docket No. 55, at 7.

Plaintiffs initiated this infringement action on October 11, 2011, the day after the expiration of the standstill agreement.  Docket No. 1; Parties' Joint Statement of Undisputed Facts ¶ 30.  Plaintiffs alleged that Defendants misappropriated and infringed upon Plaintiffs' "Sun Earth" trademark, service mark and trade name.  In their first amended complaint (1AC), Plaintiffs assert claims for trademark and trade name infringement under the Lanham Act, 15 U.S.C. §§ 1125(a), et seq., California law, Cal. Bus. & Prof. C. §§ 14415 and 14402, and common law, as well as cybersquatting under the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d).  Docket No. 84.  Plaintiffs further assert claims based on trademark and trade name

infringement for unfair competition under the Lanham Act and the common law, and for unjust enrichment.  Docket No. 81.

In their original answer, Defendants asserted counterclaims against Plaintiffs for common law unfair competition and violation of California's unfair competition statute.  Thereafter, after Plaintiffs answered the counterclaims, Defendants filed an amended answer, in which they omitted their counterclaims.  Docket Nos. 85, 86.[9]

On February 2 and 3, 2012, the Court granted Plaintiffs' motion for a preliminary injunction and entered an injunction against Defendants.  Docket Nos. 60, 62.  On March 13, 2012, the Court granted Defendants' motion to modify the preliminary injunction, inter alia, to "add terms that would explicitly allow Defendants to import their products into the United States for sale under a non-infringing name, such as NBSolar," recognized that, "in order to do so, Defendants may be required to identify SESP as the manufacturer of the products in certain instances," and limited "Defendants to identifying SESP as the manufacturer, importer or seller of goods branded as NBSolar to the minimum extent necessary as required by law or ordinary business customs to operate within the United States under the NBSolar name."

United States District Court
For the Northern District of California

---

[9] At the final pretrial conference, the Court told Defendants that the counterclaims would be dismissed with prejudice, unless Defendants pursued them at trial or informed the Court that they wanted to dismiss the counterclaims without prejudice and provided authority that would allow them to do so.  Defendants did not pursue the counterclaims or seek to dismiss them without prejudice.  Accordingly, the Court DISMISSES Defendants' counterclaims with prejudice.

Docket No. 79, 5-6.  The Court issued a modified preliminary injunction on that date.  Docket No. 80.

On June 20, 2012, the Court granted in part Plaintiffs' motion to hold Defendants in civil contempt for violation of the preliminary injunction.  Docket No. 106.  The Court found clear and convincing evidence that Defendants had not complied with the Court order regarding their website by the time specified in the order, but found that Defendants had since brought their website into compliance and declined to issue sanctions on that basis. Id. at 11-12.  The Court also found that Defendants were in contempt of the Court's order through their ongoing advertising within the United States in the Photon International magazine and failure to file a proper status report setting forth the manner in which they had complied with the preliminary injunction.  Id. at 12-17.

CONCLUSIONS OF LAW

I.   Trademark and trade name claims

"All of [Plaintiffs'] infringement claims are subject to the same test."  Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008) (citations omitted); see also M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005) (noting, "The test of trademark infringement under state, federal, and common law is whether there will be a likelihood of confusion," and that other claims, including for common law and statutory unfair competition, are evaluated based on whether there is a likelihood of confusion).  To prevail on a claim of trade name or trademark infringement, a plaintiff "must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the

23

defendant's use of the mark is likely to cause consumer confusion." Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)). Plaintiffs are required to prove the elements of their claims for trademark infringement by a preponderance of the evidence.

While "[t]rademarks and trade names are technically distinct,"[10] they are accorded "the same broad level of protection" and infringement of both is analyzed under practically indistinguishable standards. Accuride International, Inc. v. Accuride Corp., 871 F.2d 1531, 1534-1536 (9th Cir. 1989). Similarly, "service marks and trademarks are governed by identical standards and thus like with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered." Chance v. Pac-Tel Teletrac, Inc., 242 F.3d 1151, 1156 (9th Cir. 2001) (citations omitted). See also American Steel Foundries v. Robertson, 269 U.S. 372, 380 (1926) ("Whether the name of a corporation is to be regarded as a trade-mark, a trade name, or both, is not entirely clear under the decisions.  To some extent, the two terms overlap. . . . But the precise difference is not often material, since the law affords protection against its appropriation in either view upon the same fundamental principles.") (citations omitted).

---

[10] Under the Lanham Act, trademarks refer to the words or symbols used to identify and distinguish particular goods; service marks refer to those used for services; and trade names refer to those used for a business or enterprise.  See 15. U.S.C. § 1127.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

A. Protectable ownership interest

Plaintiffs have shown that they have a protectable ownership interest in the term SunEarth as a trademark, trade name and service mark. "It is axiomatic in trademark law that the standard test of ownership is priority of use." Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219 (9th Cir. 1996). When proving ownership, "[f]ederal registration of a trademark 'constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark' in commerce." Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006) (quoting Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1047 (9th Cir. 1999)). Defendants registered their Sun-Earth mark with the USPTO through an application filed on December 12, 2008, and are therefore entitled to a presumption of ownership for this date. See Sengoku Works, 96 F.3d at 1219 ("the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration"); Rolley, Inc. v. Younghusband, 204 F.2d 209, 211 (9th Cir. 1953) ("Upon registration the presumption as to date of first use by the registrant has been held to extend back to the filing date").[11]

---

[11] Defendants state that they "first applied for" registration of the trademark "in 2006." Opp. at 4. However, while they filed their first application on July 5, 2006, they abandoned that application, Reed Decl., Ex. 12, and are not entitled to a presumption of ownership from the date of filing of that application.

However, "the non-registrant can rebut this presumption by showing that . . . he used the mark in commerce first." Sengoku Works, 96 F.3d at 1220.  Plaintiffs have introduced evidence that they have used the term SunEarth as a trademark, trade name and service mark in the United States since 1978.  Defendants have conceded that Plaintiffs have "common law prior user rights in several states of the United States to its SunEarth mark for solar thermal systems."  Defs.' Trial Brief, Docket No. 128, 1.

Defendants dispute the "geographic extent of Plaintiffs' common law prior use rights to its 'SunEarth' name and mark." Joint Pretrial Conference Statement, Docket No. 126, 7. "Generally, the senior user of a mark is entitled to assert trademark rights in all areas in which it has legally sufficient market penetration.  This is determined by examining the trademark user's volume of sales and growth trends, the number of persons buying the trademarked product in relation to the number of potential purchasers, and the amount of advertising."  Glow Indus. v. Lopez, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002).  "Where the trademark user has acquired a national reputation associated with its mark, it may assert trademark rights even in areas where it has no sales."  Id. at 983 (citing Champions Golf Club v.

---

Further, though Defendants repeatedly point to 2003 as the earliest time that they used the Sun-Earth mark outside of the United States, see, e.g., Opp. at 3, this is irrelevant to their ownership interest in the mark within the United States.  See J. McCarthy, Trademarks and Unfair Competition, § 26:5 n.1 (stating that "first use outside the United States does not count," and explaining, "The concept of territoriality is basic to trademark law.  Rights accrue in each nation only by use or fame of the mark in that nation.").

United States District Court
For the Northern District of California

_Champions Golf Club_, 78 F.3d 1111, 1124 (6th Cir. 1996); _Golden Door, Inc. v. Odisho_, 437 F. Supp. 956, 962 (N.D. Cal. 1977)).

Plaintiffs have established legally sufficient national market penetration over their trade name and mark prior to 2007. Unlike in _Glow Industries_, Plaintiffs have provided sufficiently specific information to "assist the court in quantifying market penetration, sales levels, growth trends, or the number of people who purchased the company's products in relation to the number of potential customers," _Glow Indus._, 252 F. Supp. 2d at 984-85, through the testimony of the company president, Richard Reed, and corroborating evidence thereof, including news articles.

Accordingly, the Court finds that Plaintiffs have proven a protectible ownership interest in the trade name and mark that is senior to that of Defendants.

B. Likelihood of confusion

In determining whether there is a likelihood of confusion, a court is to weigh the following factors: 1) the strength of the mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) type of goods and the degree of care likely to be exercised by the purchaser; 7) the defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines. _See AMF Inc. v. Sleekcraft Boats_, 599 F.2d 341, 348-49 (9th Cir. 1979). The similarity of the marks, proximity of the goods and marketing channels used constitute "the controlling troika in the _Sleekcraft_ analysis." _GoTo.com Inc. v. Walt Disney Co._, 202 F.3d 1199, 1205 (9th Cir. 2000). However, the analysis is not to be considered in a mechanical fashion, and instead the importance of each

United States District Court
For the Northern District of California

Sleekcraft factor will vary in each particular case.   Brookfield
Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1055 n.16
(9th Cir. 1999).

    At trial and consistently through this case, Defendants'
arguments have been aimed at dispelling the possibility of product
confusion, that is, that a potential buyer would mistakenly
purchase Defendants' product, believing it to be made by
Plaintiffs.  For example, they contend that potential purchasers
will first decide whether to buy a photovoltaics system or a
thermal collector and then will shop for products within that
subcategory, with only photovoltaics manufacturers competing with
Defendants for customers.  However, "product confusion is not the
kind of confusion that is at issue in the usual trademark case,"
especially where, as here, the products manufactured by the
parties are alleged to be in related, though not identical,
product areas.  J. McCarthy, Trademarks and Unfair Competition
§ 23:5, at 42-43.  Instead, the relevant inquiry is into other
types of confusion, such as source confusion.   Id.; see also
Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149,
151-52, 159 (9th Cir. 1963) (in a suit brought by the maker of
"Black & White" whiskey, finding that the relevant question was
not whether there was product confusion, but rather "whether the
use by [the defendants] of the name 'Black & White' on their beer
is likely to cause confusion or mistake or to deceive purchasers
as to the source of origin of such goods or services . . . The use
need not be the same as, nor one in competition with the original
use.").

Further, initial interest confusion, involving "the use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement'" and is actionable under the Lanham Act. Brookfield Communs., 174 F.3d at 1062-63. Defendants have in fact acknowledged that this type of confusion is a reasonable prospect here. See 2nd Dong Decl. ¶ 38, Docket No. 124-1, ¶ 38 ("I think here Plaintiffs have a point, in that someone who is looking for their booth at that trade show and who sees in the distance the name Sun-Earth on our booth may walk toward our booth, and even reach it. When the person reaches the booth, however, he will readily realize that since all we sell are PV panels imported from China, we are an entirely different company from SunEarth Inc.").

In addition, as Plaintiffs point out, the danger here is not the classic type of source confusion, "forward confusion," where customers "want to buy the senior user's product and because of the similarity of marks, mistakenly buy the junior user's product instead" and the junior user thus trades on the goodwill of the senior user. J. McCarthy, Trademarks and Unfair Competition § 23:10. Instead, the danger is "reverse confusion," which "occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user" and the senior user is pushed from the market or forced to abandon its trade name to differentiate itself. Id.; see also Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir. 2005) (explaining the difference

United States District Court
For the Northern District of California

between forward and reverse confusion). Courts have found that reverse confusion is actionable for infringement of unregistered marks. See, e.g., Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 490-91 (2d Cir. 1988).

Upon consideration of the Sleekcraft factors, the Court finds that Plaintiffs have established a likelihood of confusion.

1. Similarity of the marks[12]

The greater the similarity between the two marks at issue, the greater the likelihood of confusion. Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002). "[L]ess similarity between the marks will suffice when the goods are complementary, . . . the products are sold to the same class of purchasers, . . . or the goods are similar in use and function." Sleekcraft, 599 F.2d at 341.

This factor heavily favors Plaintiffs, and Defendants have presented no argument that the marks are dissimilar. Plaintiffs have accused Defendants' Sun-Earth trademark, a combination of a picture design and words, of infringing upon Plaintiffs' trade name (SunEarth, Inc.) and trademark and service mark (SunEarth), which consists of words. "[I]t is well settled that if a mark comprises both a word and a design, then the word is normally accorded greater weight, because it would be used by purchasers to request the goods." L.C. Licensing, Inc. v. Cary Berman, 86 U.S.P.Q.2d 1883, 2008 WL 835278, at *3 (T.T.A.B. 2008). See also

_____

[12] Following the Ninth Circuit's guidance, the Court considers the Sleekcraft factors roughly in order of their importance in this particular case and does not automatically adopt the ordering of those factors from Sleekcraft or any other case. Brookfield Communs., 174 F.3d at 1055 n.16.

Herbko Int'l v. Kappa Books, 308 F.3d 1156, 1165 (Fed. Cir. 2002) ("The words dominate the design feature."). While Defendants' mark is somewhat different in appearance, the sound, meaning and appearance of the text are identical. Further, within the text, both marks have similar capitalizations within the lettering, though Defendants use a hyphen and Plaintiffs do not, and both words sound identical when spoken aloud.

2. Strength of the marks

"The strength of the trademark is evaluated in terms of its conceptual strength and commercial strength." Mortgage Elec. Registration Sys. v. Brosnan, 2009 U.S. Dist. LEXIS 87596, at *13 (N.D. Cal.) (citing Brookfield Communs., 174 F.3d at 1058).

In terms of conceptual strength, "[m]arks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998). "The latter three characterizations are inherently more distinctive and, hence, are associated with stronger marks." Mortgage Elec. Registration Sys., 2009 U.S. Dist. LEXIS 87596, at *13 (citing Kendall-Jackson Winery, 150 F.3d at 1047). "Marks that are merely generic or descriptive of a product are not inherently distinctive and must have acquired distinctiveness to warrant protection." Metro Publ'g, Inc. v. Surfmet, Inc., 2002 U.S. Dist. LEXIS 26232, at *25 (N.D. Cal.).

The Court finds that this factor also weighs heavily in favor of Plaintiffs. Plaintiffs' mark is at least suggestive and is therefore inherently distinctive. See Brookfield Communs., 174

United States District Court
For the Northern District of California

F.3d at 1058, n.19 ("A suggestive mark conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature."). It is more than descriptive, because it does not "define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." Kendall-Jackson Winery, 150 F.3d at 1047, n.8.

Further, Plaintiffs' trade name and mark have been used for over thirty years to identify their business and, under that name and mark, Plaintiffs have gained national recognition as leaders in their field, which has led to, among other things, their products being installed on the White House. Thus, Plaintiffs' trade name and mark are fairly strong. See Accuride, 871 F.2d at 1536 ("extensive advertising, length of exclusive use, [and] public recognition" among factors that may strengthen a suggestive mark).

### 3. Proximity of the goods

This factor concerns the proximity or relatedness of the good or services represented by the potentially infringing marks. "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sleekcraft, 599 F.2d at 341. The proximity of goods is measured by whether the products are (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. Id. at 350.

Defendants argue that, because they sell photovoltaic products, which collect electricity that can be sold to the grid,

32

and Plaintiffs do not sell photovoltaic products and instead sell solar collectors, the parties' products have dissimilar uses and functions, precluding a finding of confusion.  However, Defendants focus on exact identity of products, taking too narrow a view of relatedness.  Palantir Techs. Inc. v. Palantir.net, Inc., 2008 U.S. Dist. LEXIS 6448, at *14-15 (N.D. Cal.) (use of identical marks likely to cause confusion where plaintiff's and defendant's goods and services were related generally to the computer software industry, even though their "lines of business" were "not identical").

Plaintiffs have offered evidence that at least one of their products, the SunEarth CompRail, may be used directly in conjunction with Defendants' products, as a mounting system for the latter.  In addition, the SunEarth Solaray water heating system is available with a photovoltaic-powered pump.  Further, some customers may choose between the two types of products to lower their energy bills with solar technology or may choose to use both types of products.  Both companies create products that are installed in commercial, industrial and home settings; though Defendants do not target home consumers themselves and their primary customers are utility companies, they sell products to installation companies that do and they advertise on their website that their products are used in home systems.  Further, Defendants admit that they are just beginning to develop relationships with utility markets within the United States and almost all of their sales within the United States are for commercial rooftop applications.  Dong Direct Exam. ¶¶ 36-37.  Thus, even if they are not identical, the groups of customers do overlap.  Within

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

California, contractors who install either type of products fall within the same licensing category.  See Cal. Code Regs. tit. 16, § 832.46.  Plaintiffs also introduce evidence that at least some participants in both the photovoltaics market and the solar thermal collector market use the same mark in commerce to brand both types of goods.  Ballard Decl., Ex. A.

Accordingly, this factor weighs in favor of Plaintiffs.

4. Type of goods and degree of care of purchaser

"Low consumer care . . . increases the likelihood of confusion."  Playboy Enterprises, Inc. v. Netscape Communs. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004).  "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . .  When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely.  Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  Sleekcraft, 599 F.2d at 353 (citations omitted).

The parties sell their products to wholesalers, contractors, builders and other solar installers.  Further, the products at issue are generally expensive.  Accordingly, this factor weighs in favor of Defendants.

5. Marketing channels used

"'Convergent marketing channels increase the likelihood of confusion.'"  Official Airline Guides, Inc., v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993) (quoting Nutri/System, Inc. v. Con Stan Indus., Inc., 809 F.2d 601, 606 (9th Cir. 1987)).

34

    Plaintiffs present evidence that the parties sell their
products in niche marketplaces including solar products shows,
specialty retailers and trade magazines, and that the parties have
recently attended several of the same trade conventions.
Defendants do not contest that the parties use overlapping
marketing channels but argue that these "channels are used not to
generate sales, but rather to generate contacts, which may lead to
sales after the customer learns more about the company."  Defs.'
Trial Brief, 5 n.1.  Although the sales may not actually take
place at the trade shows, these are nevertheless marketing
channels that are used to generate sales.  Accordingly, this
factor favors Plaintiffs.

        6. Actual confusion

    "Consumer confusion" is the "linchpin" of trademark
infringement rather than "generalized public confusion."  Rearden,
683 F.3d at 1214 (internal quotation marks and citations omitted).
However, non-consumer confusion is also relevant to this inquiry,
at least where it "bears a relationship to the existence of
confusion on the part of consumers themselves," such as when it is
on the part of "(1) potential consumers; (2) non-consumers whose
confusion could create an inference that consumers are likely to
be confused; and (3) non-consumers whose confusion could influence
consumers."  Id. (declining to decide "whether there are other
circumstances or grounds for taking into account non-consumer
confusion").

    Plaintiffs have offered some evidence of actual confusion on
the part of potential consumers.  Mr. Frenette testified that, "on
some occasions," he had to explain the difference between the

parties to clarify to customers that Plaintiffs were not the source of the products he was selling.  He further stated that, when he explained the difference, frequently customers would become disinterested because they had been looking for solar thermal collectors.  Mr. Frenette, however, was unable to estimate how often he had to clarify this or how many customers had been involved.

Plaintiffs' other instances of confusion are not relevant. Plaintiffs do not offer an explanation of how potential confusion on the part of Mr. Nelson, Ms. Ross or trade show organizers may be relevant to possible consumer confusion.

Accordingly, the Court finds that this factor weakly favors Plaintiffs.

7.    Likelihood of expansion of the product lines

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354.  "When goods are closely related, any expansion is likely to result in direct competition." Id.

Plaintiffs have offered testimony that they would like to use the SunEarth name to expand into the photovoltaic market.  The possibility of this is strengthened by Plaintiffs' past involvement in this area.  Although Plaintiff SunEarth, Inc. is not currently selling photovoltaics, it developed a prototype for a hybrid photovoltaic thermal array that combined both technologies into the same unit.  Further, it helped to found a company that makes such a product commercially.  These projects

**United States District Court**
For the Northern District of California

support that Plaintiffs have interest in using the SunEarth name in the photovoltaic space, and that SunEarth, Inc. has the skills, methods and technical knowledge to enter the photovoltaics market and has in fact been innovative in it.

Further, Plaintiffs have submitted evidence that Solaray, the parent company of SunEarth, Inc., has been selling photovoltaic products and that it has in fact substantially increased this aspect of its business in recent years.  Thus, Plaintiffs have also established that they do in fact already sell products that are in the same market as Defendants and have interest in doing so.  The recent success that Solaray has experienced in this field in Hawaii also makes substantially more plausible that it would want SunEarth, Inc. to expand in this space in the California market.

Accordingly, this factor strongly favors Plaintiffs.

### 8. Defendants' intent in selecting the mark

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." Brookfield Communs., 174 F.3d at 1059 (citing Official Airline Guides, 6 F.3d at 1394; Fleischmann Distilling, 314 F.2d 149 at 157).  "The law has long been established that if an infringer adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." Brookfield Communs., 174 F.3d at 1059 (internal quotation marks and citations omitted); see also Playboy Enterprises, 354 F.3d at 1028, ("A defendant's intent to confuse constitutes probative evidence of

likely confusion: courts assume that the defendant's intentions were carried out successfully."). Courts have acknowledged that the intent inquiry is altered in reverse confusion cases. Several courts have stated that in such cases, "the relevant inquiry to determine intent was whether, despite acting innocently, the alleged infringer was careless in not conducting proper research, to avoid infringement, prior to development of its trademark or trade dress." Rainforest Café, Inc. v. Amazon, Inc., 86 F. Supp. 2d 886, 899 (D. Minn. 1999) (citing Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3rd Cir. 1994); Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir.1983)); see also Commerce Nat., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 444 (3rd Cir. 2000) (stating that, in a reverse confusion case, "the intent inquiry must also be altered to focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark"), cited with approval in Cohn v. Petsmart, Inc., 281 F.3d 837, 841 (9th Cir. 2002).

Regardless, "an intent to confuse consumers is not required for a finding of trademark infringement." Id. (citations omitted). "Instead, this factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration)." Id. Thus, although "the presence of intent can constitute strong evidence of confusion," the "converse . . . is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers

likely will be confused as to source." Id. (quoting Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr., 109 F.3d 275 (6th Cir. 1997)); see also McCarthy, Trademarks and Unfair Competition, § 23:124 ("While the accused infringer's bad faith intent to cause confusion is admitted as evidence of liability, evidence of good faith is not a defense to liability.  A mistaken, good faith belief will not excuse otherwise illegal infringement.").

Mr. Dong credibly and consistently testified in person at the bench trial that Defendants chose to adopt the Sun Earth mark in the United States at the start of 2011 in order to unify the brand that they were using there with that used in Europe and China and not in order to be associated with Plaintiffs.  That Defendants did not intend to copy Plaintiffs' mark and capitalize on their goodwill but rather to associate their brand in the United States with their brand elsewhere is further supported by the facts that Defendants had used this mark in China and elsewhere for a number of years before they learned of Plaintiffs' existence.

However, Defendants should have known of Plaintiffs' senior rights to the mark and failed to conduct a reasonable inquiry into whether there were any senior users.  Defendants acknowledge that at no point did they try to conduct any such inquiry and instead assumed the USPTO would do this for them.  Further, by the time that they re-adopt this mark for use in the United States, Defendants were aware of Plaintiffs' use of the mark and thus were on notice that an investigation into the rights of others was warranted.

Accordingly, the evidence supports a finding that Defendants did not take reasonable steps to investigate the mark before

39

entering the market. Such a finding satisfies this factor and thus favors Plaintiffs.

9. Summary

Having considered the Sleekcraft factors and the facts of this case, the Court concludes that Plaintiffs have met their burden to show that Defendants' use of the Sun Earth mark is likely to cause consumer confusion.

C. Laches

"Laches is an equitable defense to Lanham Act claims." Internet Specialties West, Inc. v. Milon-Digiorgio Enters., 559 F.3d 985, 989 (9th Cir. 2009) (citing GoTo.com, 202 F.3d at 1209). "This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights." Id. at 989-90 (citing Grupo Gigante S.A. de C.V. v. Dallo & Co., 391 F.3d 1088, 1102-03 (9th Cir. 2004)). Defendants bear the burden of establishing the elements of their affirmative defense by a preponderance of the evidence.

"The test for laches is two-fold: first, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay?" Id. at 990 (citing Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002); Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association, 465 F.3d 1102, 1108 (9th Cir. 2006)). To determine if plaintiffs have acted diligently, a court must determine if they filed suit within the applicable statute of limitations period, "thereby creating a presumption against laches," or if they filed suit outside of the limitations period, creating a

United States District Court
For the Northern District of California

presumption that "laches is applicable." Id. (citing Jarrow, 304
F.3d at 835-36). In a trademark case, "the limitations period for
laches starts from the time that the plaintiff knew or should have
known about its potential cause of action." Id. at 986.

Because "[t]he Lanham Act contains no explicit statute of
limitations," a court borrows the statute of limitations for
laches from an analogous state law. Jarrow, 304 F.3d at 836.
Defendants previously conceded, and do not dispute now, that the
"presumption of laches for trademark infringement in California
applies after [a] four-year delay." Defs.' Opp. to Pls.' Mot. for
a Prelim. Inj., Docket No. 43, 9 & n.3; see Internet Specialties
West, 559 F.3d at 990 n.2 ("Neither party disputes the imputation
of the four-year limitations period from California trademark
infringement law, and we agree that this was the correct period to
use.").

Because the standstill agreement began on June 13, 2011, the
first question is whether Plaintiffs had reason to know of
Defendants' use of their name and mark prior to June 13, 2007,
giving rise to a presumption of laches.[13] Defendants contend that
there is a dispute that their "U.S. sales in 2007, three years of
PHOTON advertisements, and initial presence as a Megawatt sponsor
on the Long Beach show's website" were sufficient to put
Plaintiffs on "constructive notice" of their infringing use prior

_____

[13] Plaintiffs argue for the first time in their reply that the
"proper commencement date for laches analysis is April 1, 2007,
four years prior to the date Plaintiffs filed their Cancellation
proceedings in the U.S.P.T.O." Reply at 7 n.8. Because this was
raised for the first time in their reply, Defendants did not have
an opportunity to address this and the Court does not entertain it
now.

United States District Court
For the Northern District of California

to this time.  Opp. to Pls.'s Mot. for Summ. J., Docket No. 124, 20.  However, the facts do not establish that Plaintiffs knew of Defendants' sales starting in April 2007, of Defendants' use of the Sun Earth logo in connection with the 2007 tradeshow-- particularly since Defendants substituted the nbsolar mark in the program materials months in advance of the event--or of the advertisements for Defendants in <u>Photon International</u>.[14]

Further, even assuming that Plaintiffs should have known about Defendants' infringing conduct in 2007, the undisputed evidence in the record establishes that Defendants abandoned their use of the infringing mark in 2007 and did not adopt it again until 2010.  Thus, any need or motivation that Plaintiffs would have had to bring suit in 2007 was obviated by the abandonment, until Defendants again decided to use the mark.  As such, any presumption in favor of laches that would have applied outside of the limitations period would be rebutted.

Finally, Defendants make no argument that they were prejudiced by any delay.  Even if they had, this is not an instance in which a party had used the entire four year period building up good faith around a trade name or mark within the United States.  Defendants agree that they started using the Sun-Earth mark again in the United States in January 2011.  Parties'

_____

[14] The Court notes that Defendants argue that Photon International is primarily targeted at the international, non-United States photovoltaic community.  Thus, under Defendants' own contentions, even if Plaintiffs had known about these advertisements, they may not have been sufficient by themselves to put Plaintiffs on notice that Defendants were using the mark in commerce in the United States.

Joint Statement of Undisputed Facts ¶ 23. Thus, they used it for less than a year prior to the institution of this suit.

Accordingly, the Court concludes that Defendants did not prove the elements of their affirmative defense of laches.

D. Remedies

1. Cancellation of Defendants' trademark

Plaintiffs argue that Defendants' trademark, United States Registration Number 3,886,941, should be cancelled under 15 U.S.C. § 1119 and the inherent powers of the Court. Defendants respond only that cancellation is not warranted because Plaintiffs have not demonstrated a likelihood of confusion.

Tile 15 U.S.C. § 1119 provides, "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." Here, the Court has held that Plaintiffs have a protectable interest in the Sun Earth mark and that Defendants use thereof infringes these rights. Thus, because Defendants do not have a right to registration of this infringing mark, the Court orders the cancellation of Registration No. 3,886,941.

2. Injunctive relief

Title 15 U.S.C. § 1116(a) provides that the court "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of" the Lanham Act. Both parties have submitted proposed permanent injunctions for the Court's consideration. Docket Nos. 126-1, 144.

Plaintiffs ask that, if the Court finds in their favor on their motion for summary judgment, it issue a permanent injunction enjoining Defendants from using the SunEarth mark.  Plaintiffs contend that they will suffer irreparable injury in the absence of such relief because they will lose control over their name, reputation and goodwill.  Plaintiffs further argue that a permanent injunction will serve the public interest by reducing customer confusion and that Defendants will not be harmed because they have already represented that they will abandon the use of the Sun Earth mark in the United States.

Defendants respond that, if the Court finds liability, it limit any injunction to trade shows.  They argue that this is the only source of customer confusion that Plaintiffs have shown. However, even if this were an appropriate basis on which to limit an injunction, Plaintiffs have offered evidence of customer confusion in other settings, including when approached by Defendants' sales people outside of trade show settings, in the form of testimony by Mr. Frenette.

Defendants also ask that they be allowed to advertise using the Sun Earth mark in the Photon International magazine and other publications "primarily directed to markets" outside of the United States.  See Defs.' Proposed Permanent Inj., Docket No. 144, ¶ 2. The preliminary injunction allows Defendants to use the mark to advertise in magazines and other media outside of the United States, but not within the United States.  Although Defendants aver, though Mr. Dong's testimony, that only "a little more than 1,000" copies of the magazine, out of a total "print run of 28,000 copies per month for its English edition," are sent to subscribers

in the United States, Dong Direct Exam. ¶ 87, Defendants' figures
are misleading, because the number sent to United States
subscribers constitutes about twenty percent of the number sent to
subscribers directly anywhere in the world, with the remaining
amount distributed at trade shows, including in the United States.
See Proffitt Decl., Docket No. 90-1, ¶ 11, Ex. 7, 2.  As the Court
has previously found, this is not de minimis.

        Finally, Defendants contend that they should be permitted to
identify "Sun Earth Solar Power Co., Ltd." as the manufacturer on
their product labels.  They argue that this is necessary in order
to conduct business in the United States at all, even under the
name NBsolar, because they need to identify the actual
manufacturer for a variety of reasons, including to United States
Customs and Border Patrol for the purposes of tariff charges, to
other government entities such as the California Energy Commission
so that customers will be eligible for financial incentives and
tax credits, and to end customers for warranty purposes.  They
have submitted evidence in support of these contentions and also
to support that there are no feasible alternatives that actually
avoid these problems, such as private labeling, in which a
manufacturer makes products for a third party, which then sells
the products under its own brand.

        The Court agrees that it would not be equitable or reasonable
to enter an injunction so broad that it would prevent any
importation of Defendants' products, even to be sold under the
NBsolar mark and not the Sun Earth mark.  The Court thus finds it
appropriate to include in the permanent injunction provisions that
allow for this, similar to those that the Court included in the

**United States District Court**
For the Northern District of California

modified preliminary injunction.  The Court will issue an

appropriate injunction in a separate document.

### 3. Attorneys' fees

Plaintiffs request that they be awarded attorneys' fees.

Title 15 U.S.C. § 1117 allows the court in "exceptional cases" to

"award reasonable attorney fees to the prevailing party."

"Exceptional cases include cases in which the infringing party

acted maliciously, fraudulently, deliberately or willfully."

Lahoti v. Vericheck, Inc., 636 F.3d 501, 510 (9th Cir. 2011).

Plaintiffs contend that this is an exceptional case.  They

argue that Defendants' infringement was willful because they

infringed after having acquired actual knowledge of Plaintiffs'

use of the mark.  ""Willful infringement carries a connotation of

deliberate intent to deceive.  Courts generally apply forceful

labels such as 'deliberate,' 'false,' 'misleading,' or

'fraudulent' to conduct that meets this standard." Lindy Pen Co.

v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993).  Plaintiffs

maintain that Defendants were "willfully blind."  "To be willfully

blind, a person must suspect wrongdoing and deliberately fail to

investigate." Hard Rock Cafe Licensing Corp. v. Concession

Services, Inc., 955 F.2d 1143, 1149 (7th Cir. 1992).  Thus,

Defendants' state of mind is relevant to this conclusion and a

finding of willful blindness cannot be based simply on a negligent

failure to take action.  Id.; see also Lindy Pen, 982 F.2d at 1406

("Willfulness and bad faith 'require a connection between a

defendant's awareness of its competitors and its actions at those

competitors' expense.'") (quoting ALPO Petfoods, Inc. v. Ralston

Purina Co., 913 F.2d 958, 966 (D.C. Cir. 1990)).  Here, the

evidence shows that Defendants were negligent in their failure to investigate Plaintiffs' senior rights, but not that they deliberately and consciously failed to do so.

Plaintiffs also argue that Defendants' "lack of cooperation" and "disrespect for the judicial process" during these proceedings warrant an award of attorneys' fees.  They point to the Court's contempt findings.  However, the Court's contempt sanctions addressed those findings adequately and these circumstances do not warrant a finding that this is an exceptional case.  Plaintiffs also point to Defendants' misstatements in various declarations submitted during these proceedings.  Although Plaintiffs are correct that in each of these instances, Defendants did make a material misrepresentation to the Court or to Plaintiffs, these appear to have been the result of mistake and carelessness, rather than an intentional attempt to deceive.  Further, in each instance, when Defendants realized they made an error, they affirmatively acknowledged and corrected it.

Accordingly, the Court finds that this is not an exceptional case warranting an award of attorneys' fees under § 1117(a).

### 4. Accounting and disgorgement of profits

Under the Lanham Act, a plaintiff "shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Under § 1117(a), a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits.  See Lindy Pen, 982 F.2d at 1407.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Here, Plaintiffs do not seek to recover profits as a measure of their own lost sales as a result of competition. Instead, they proceed under the second theory and argue that recovery of lost profits is necessary to "making any violations of the Lanham Act unprofitable to the infringing party." Pls.' Reply Brief on Remedies, Docket No. 160, 7. The Ninth Circuit has found, "Where trademark infringement is deliberate and willful, . . . a remedy no greater than an injunction 'slights' the public." Lindy Pen, 982 F.2d at 1407 (citing Playboy Enterprises, 692 F.2d at 1274). In Lindy Pen, the Ninth Circuit warned, "This standard applies, however, only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark'" and, "[w]hen awarding profits, the court is cautioned that the 'Plaintiff is not . . . entitled to a windfall.'" Id. (citations omitted). Later, in applying Lindy Pen, the Ninth Circuit found that in circumstances where a plaintiff did not seek damages based on lost sales, the plaintiff could recover profits "only if the infringement was willful." Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1996).

Here, as addressed above, although Plaintiffs argue that Defendants were "willfully blind," Plaintiffs have not made an adequate showing of this. To the extent that Plaintiffs argue that disgorgement is available under the circumstances here in a reverse confusion case, where Defendants negligently failed to investigate senior rights before adopting a mark but did not willfully infringe, this cannot be reconciled with the language of Lindy Pen. The court there explicitly stated that "this court has cautioned that an accounting is proper only where the defendant is

'attempting to gain the value of an established name of another.'" 982 F.2d at 1406 (quoting Maier Brewing Co., 390 F.2d at 123). Further, although the Ninth Circuit has stated that it "will grant an accounting of profits in those cases where infringement yields financial rewards," id., there is no evidence that Defendants did realize any such gain as a result of the infringement itself or that Plaintiffs suffered any financial harm.  Thus, an accounting would be inequitable here and would lead to a windfall for Plaintiffs.  See id. at 1407 ("To award profits in this situation would amount to a punishment in violation of the Lanham Act which clearly stipulates that a remedy 'shall constitute compensation not a penalty.'") (quoting 15 U.S.C. § 1117(a)).[15]

## II.  Cybersquatting

"In 1999, Congress passed the Anticybersquatting Consumer Protection Act ('ACPA'), 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting." Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005). "Cybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." Id. (quoting DaimlerChrysler v. The Net Inc., 388 F.3d 201, 204 (6th Cir. 2004)).

---

[15] Because the Court finds that an accounting and recovery of profits is not warranted here, the Court DENIES AS MOOT Plaintiffs' motion in limine seeking to exclude Defendants' evidence of the expenses that they incurred in selling their Sun Earth branded products in the United States (Docket No. 133).

United States District Court
For the Northern District of California

"A plaintiff pursuing a cybersquatting claim under the ACPA must show that: (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." Rearden, 683 F.3d at 1219; see also 15 U.S.C. § 1125(d)(1)(A) (setting forth elements). 15 U.S.C. § 1125(d)(1)(C) provides, "In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."

ACPA contains a safe harbor defense for registrants who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). However, the Ninth Circuit has cautioned that the safe harbor defense should be invoked "very sparingly and only in the most unusual cases." Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1203 (9th Cir. 2009). A defendant "who acts even partially in bad faith" cannot successfully assert a safe harbor defense. Id.

Plaintiffs seek transfer of Defendants' seven domain names under the provisions of this section. In opposition, Defendants first contend that, in their 1AC, Plaintiffs do not accuse the sunearthsolar.net, sunearthsolarpower.com and sunearthsolarpower.net domain names. See 1AC ¶ 68. Plaintiffs do not address this directly, although they do point out that the sunearthsolar.net domain name was not disclosed by Defendants in

discovery.  See Docket No. 71-8 (declaration with list of domain

names that omits sunearthsolar.net); see also Xie Depo., Docket

No. 71-9, 31:23-32:17 (testifying that Defendants did not have any

other domain names with the words "Sun Earth").  Accordingly, the

Court finds good cause to permit Plaintiffs to amend the complaint

belatedly to add this domain name.  However, the remaining domain

names were disclosed to Plaintiffs prior to the last amendment of

their complaint.  Thus, the Court finds that the

sunearthsolarpower.com and sunearthsolarpower.net domain names are

not properly at issue for the cybersquatting claim.

Defendants do not contest that the first two elements of an

ACPA claim are met.  Instead, they contend that they did not act

in bad faith and they are protected by the safe harbor defense.

The Ninth Circuit recently summarized "three analyses"

implicated when assessing bad faith under the ACPA:

> (1) surveying the nine non-exclusive and permissive
> statutory factors that "may" be considered in
> "determining whether a person has a bad faith intent,"
>
> . . .
>
> (2) taking into account the unique circumstances of each
> case, which represent "the most important grounds for
> finding bad faith," and which affect the examination
> (and weight) of the nine permissive factors as well as
> any other relevant considerations, . . . and
>
> (3) considering the availability of the safe harbor for
> any defendant who "believed and had reasonable grounds
> to believe that the use of the domain name was a fair
> use or otherwise lawful" . . .

Rearden, 683 F.3d at 1220.

United States District Court
For the Northern District of California

A. Statutory factors

    1. The trademark or other intellectual property rights
       of the person, if any, in the domain name

"This factor takes account of the fact that the same or similar marks can peacefully coexist in the marketplace without a likelihood of confusion when used in widely differing product or service lines or in remote geographic markets."  4 McCarthy on Trademarks and Unfair Competition § 25:78.  "The language of Factor (I) does not speak in terms of United States trademark rights, but refers generally to 'intellectual property rights.' This encompasses intellectual property rights irrespective of their territorial origin."  Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 234 (4th Cir. 2002).  Here, Defendants do have some intellectual property rights to the mark, at least in China.  Accordingly, this factor does not favor a finding of bad faith.

    2. The extent to which the domain name consists of the
       legal name of the person or a name that is otherwise
       commonly used to identify that person

"This factor recognizes that with the growing use of personal Web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their Web site."  4 McCarthy on Trademarks and Unfair Competition § 25:78. However, this "factor is not intended to suggest that domain name registrants may evade the application of this act by merely adopting Exxon, Ford, Bugs Bunny or other well-known marks as their nicknames."  H.R. Rep. No. 106-412, 10.

Defendants are known throughout China and Europe as "Sun Earth" and adopted this nickname in China in 1978.  Thus, this

factor favors Defendants.  <u>See Rearden</u>, 683 F.3d at 1220 ("a
reasonable jury could weigh this particular factor even more
heavily in favor of Appellants given the fact that [the domain
name] is the exact legal name recently adopted by one of the
Appellants"); <u>Harrods</u>, 302 F.3d at 234-35 (finding that this
"factor also favored the Domain Names because Harrods BA is
commonly known throughout Argentina and South America as
'Harrods'").

> 3.  The person's prior use, if any, of the domain name in
> connection with the bona fide offering of any goods
> or services

"This factor is similar to Factor (I) and recognizes that the
legitimate use of the domain name in commerce is a good indicator
of a good faith intent."  4 <u>McCarthy on Trademarks and Unfair
Competition</u> § 25:78.  The reference to "prior use" means that this
"good faith factor cannot be founded upon a purported good faith
use of the domain name undertaken only after the dispute arose and
motivated by a desire to fabricate a good faith defense."  <u>Id.</u>  "A
defendant should have the burden of introducing evidence of lawful
use to assist the court in evaluating this factor."  H.R. Rep. No.
106-412, 11.

Plaintiffs contend that Defendants did not use the domain
names in question until 2010, well after they learned of
Plaintiffs' use of the Sun Earth name in the United States.
Defendants respond that they used the sun-earth.com website
earlier than this, to redirect Internet traffic to the nbsolar.com
website, where they advertised their goods and services under the
Sun-Earth name and logo.  Because Defendants have used the

websites for bona fide offerings of goods outside of the United States, this factor favors Defendants.

> 4. The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name

The parties agree that the fourth factor is inapplicable.

> 5. The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site

"This factor embodies the traditional rule of trademark law that when there is proof that the junior user has done something to intentionally divert or confuse customers, the courts will use this, either via a presumption or as relevant evidence, that defendant was successful and that a likelihood of confusion exists."  4 McCarthy on Trademarks and Unfair Competition § 25:78. Defendants were aware of Plaintiffs' senior use in the United States when they registered each domain name, except for the sun-earth.com domain name.  As discussed above, when "an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." Official Airline Guides, 6 F.3d at 1394.  This is particularly persuasive in reference to the sunearth.us domain name, which can only be registered to a company with a United States presence. Accordingly, this factor favors Plaintiffs.

United States District Court
For the Northern District of California

6. The person's offer to transfer, sell, or otherwise
   assign the domain name to the mark owner or any third
   party for financial gain without having used, or
   having an intent to use, the domain name in the bona
   fide offering of any goods or services, or the
   person's prior conduct indicating a pattern of such
   conduct

"This factor embodies the conduct of the prototypical cybersquatter who registers a domain name with no intent to use it and offers to sell it to the legitimate trademark owner." 4 McCarthy on Trademarks and Unfair Competition § 25:78. No evidence was offered that Defendants have attempted to sell, transfer or assign the domain names to anyone for financial gain. Plaintiffs acknowledge that Defendants have made no offer to sell the domain names to them. Further, Defendants have used the sites. In addition, there is no evidence that Defendants have engaged in a pattern of the behavior relevant to this factor. Accordingly, this factor weighs in favor of a finding of good faith.

7. The person's provision of material and misleading
   false contact information when applying for the
   registration of the domain name, the person's
   intentional failure to maintain accurate contact
   information, or the person's prior conduct indicating
   a pattern of such conduct

The "provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process." 4 McCarthy on Trademarks and Unfair Competition § 25:78. However, a "mere honest mistake in identification has no such import." Id. Plaintiffs have argued that, when they registered the domain names, Defendants "did not identify itself as the registrant but rather listed a long, random string of letters that effectively

hid Defendants' identity."  Mot. for Summ. J., Docket No. 122, 32-
33.  However, as Defendants have shown, the string of letters that
they listed was not random or an effort to hide but rather was the
actual pinyin transcription of their former name, Ningbo Solar
Electric Power Co., Ltd., which was used until 2010.  On the
current record, there is no evidence that would support a finding
that Defendants provided material and misleading false contact
information when registering the domain names.  Accordingly, this
factor weighs in favor of Defendants.

> 8. The person's registration or acquisition of multiple
> domain names which the person knows are identical or
> confusingly similar to marks of others that are
> distinctive at the time of registration of such
> domain names, or dilutive of famous marks of others
> that are famous at the time of registration of such
> domain names, without regard to the goods or services
> of the parties

In this factor, Congress intended to address an "increasingly
common cyberpiracy practice known as 'warehousing', in which a
cyberpirate registers multiple domain names--sometimes hundreds,
even thousands--that mirror the trademarks of others."  H.R. Rep.
No. 106-412, 13.

Defendants' registration of multiple similar domain names
here does not support a finding of bad faith, standing by itself.
"While the registration of multiple domain names is a factor that
a court may consider in determining bad faith, Congress warned
that the ACPA 'does not suggest that the mere registration of
multiple domain names is an indication of bad faith.'"  Harrods,
302 F.3d at 234-35 (quoting H.R. Rep. No. 106-412, at 13).  "This
is presumably because many companies legitimately register many,

United States District Court
For the Northern District of California

even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words." Id. "Just as they can have several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site." Id. (quoting Porsche Cars North Am., Inc. v. Porsche.com, 51 F. Supp. 2d 707, 709 (E.D. Va. 1999)).

> 9. The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43

There is no showing that Plaintiffs' mark is "distinctive and famous" as defined in the relevant provision.

10.   Non-statutory factors

Defendants contend that the Court must take into account the unique factors of this case, which separate it from a "garden-variety cybersquatting case," including that they hold a United States registration of the Sun-Earth mark and that they have existing legitimate rights to the mark in foreign countries. See Newport Electronics, Inc. v. Newport Corp., 157 F. Supp. 2d 202, 215-16 (D. Conn. 2001) ("this is not the typical cybersquatting situation where a person registers a famous mark or name and then attempts to extort profits from the owner of the mark by selling the domain name. . . . Rather, this is a case where both parties possess trademark rights to some portion of the domain names in question."); Harrods, 302 F.3d at 240 ("this case presents us with the unusual situation of two companies named 'Harrods,' both with legitimate rights to use the 'Harrods' name in different

geographic regions. . . . The ACPA was not designed to provide a battlefield for legitimate concurrent trademark users.").

Even where both companies possess some rights to use of the domain names in different geographic areas, courts have found ACPA violations where the evidence establishes that one company intends to use the domain name to expand into the other's territory.  See, e.g., id. at 241 ("the evidence demonstrates that Harrods BA registered the 54 Domain Names with the intent to use those names in a manner calculated to confuse and deceive non-South American consumers seeking to do business with Harrods UK.  This crosses the line from a permissible intent to use Harrods BA's own South American 'Harrods' trademark on the Internet to an impermissible intent to profit online from the protected mark of Harrods UK.").  This, however, favors a finding of bad faith as to the sun-earth.us domain only.  Further, to the extent that Plaintiffs argue that a finding of bad faith is warranted based on willful blindness or Defendants' litigation conduct, these arguments are unavailing for the reasons addressed above.

Considering the statutory and other factors together, the Court concludes that Plaintiffs have not established that Defendants registered or used the domain names with a bad faith intent to profit from Plaintiffs' SunEarth mark, except as to the sun-earth.us domain.  The Court finds that transfer of this domain name to Plaintiffs is appropriate and warranted.

Although the Court does not find that Plaintiffs have established a cybersquatting claim as to the other domain names, the Court finds that, as part of the injunctive relief for the infringement claims on which they do prevail, it is appropriate

United States District Court
For the Northern District of California

and reasonable to prevent Defendants from utilizing any domain name containing Sun Earth for business within the United States. The Court will thus maintain in the permanent injunction terms similar to those in the preliminary injunction requiring that Defendants take reasonable measures to ensure that visitors to these domain names from within the United States are redirected to a webpage that explains that the companies are not affiliated with one another and allows them to continue to the sunearthinc.com or nbsolar.com webpage.

                              CONCLUSION

     Because the Court enters judgment based on its findings of fact and conclusions of law following the bench trial, Plaintiffs' motion for partial summary adjudication is DENIED AS MOOT (Docket No. 122).  Plaintiffs' motion in limine seeking to exclude Defendants' evidence of their expenses is DENIED AS MOOT (Docket No. 133).  Defendants' motion to seal is GRANTED (Docket No. 135), and within four days of the date of this Order, Defendants shall file Exhibits 1 to 12 to the Rutt declaration under seal.  The Court GRANTS in part Defendants' motion to strike and DENIES it in part (Docket No. 143).  The Court GRANTS in part Plaintiffs' request for judicial notice and DENIES it in part (Docket No. 152).

1    The Court finds in favor of Plaintiffs on their claims

2    against Defendants.  The Clerk shall enter judgment in favor of

3    Plaintiffs on their claims against Defendants and on Defendants'

4    counterclaims against Plaintiffs.  Plaintiffs shall recover their

5    costs from Defendants.  A permanent injunction will be entered in

6    a separate document.

7         IT IS SO ORDERED.

8

9    Dated: 8/23/2013

                                   CLAUDIA WILKEN
                                   United States District Judge